## COMMONWEALTH *vs.* COREY GLOVER.

No. 09-P-934.

Essex. February 8, 2010. - May 28, 2010.

Present: KANTROWITZ, GREEN, & MEADE, JJ.

Further appellate review granted, 458 Mass. 1101 (2010).

*Homicide. Self-Defense. Practice, Criminal,* Instructions to jury, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

A Superior Court judge properly denied a criminal defendant's motion for a new trial on grounds of ineffective assistance of counsel, where trial counsel's failure to request a jury instruction on manslaughter based on reasonable provocation was not manifestly unreasonable, and therefore did not create a substantial risk of a miscarriage of justice, in that trial counsel made a conscious tactical decision to focus entirely on self-defense, forgoing both argument and instruction on provocation, and where the only question posed by the jury regarded reinstruction on self-defense, manslaughter, and malice aforethought. [804-810] GREEN, J., dissenting.

INDICTMENT found and returned in the Superior Court Department on July 31, 1991.

Following review by this court, 39 Mass. App. Ct. 1121 (1996), and 50 Mass. App. Ct. 1116 (2001), a second motion for a new trial, filed on February 25, 2009, was heard by *Richard E. Welch, III,* J.

*David Keighley* for the defendant.

*David F. O'Sullivan,* Assistant District Attorney, for the Commonwealth.

KANTROWITZ, J. The defendant, Corey Glover, stabbed Forrest Hall in the neck on the night of January 9, 1991, killing him. At trial, the defendant proceeded on the theory that he acted in self-defense, but a jury rejected the argument and convicted the defendant of murder in the second degree. The defendant appeals, claiming that the tactical decision of his trial counsel to forgo a jury instruction on the alternative theory of reasonable provocation was manifestly unreasonable. We affirm.

*Background.* a. *Procedural history.* The defendant was indicted for murder in the first degree. At trial, defense counsel argued for acquittal based on self-defense, and the trial judge instructed the jury on self-defense, and voluntary manslaughter based on use of excessive force in self-defense.

After a four-day trial, the jury convicted the defendant of murder in the second degree on January 30, 1992.[1] The defendant appealed, and the conviction was affirmed by this court in an unpublished memorandum and order pursuant to rule 1:28 on January 8, 1996. See *Commonwealth* v. *Glover,* 39 Mass. App. Ct. 1121 (1996).

The defendant thereafter filed a motion for a new trial, which was denied by a judge who was not the trial judge; that denial was affirmed by this court in an unpublished memorandum and order pursuant to rule 1:28 on February 2, 2001. See *Commonwealth* v. *Glover,* 50 Mass. App. Ct. 1116 (2001). On February 25, 2009, the defendant filed a second postappeal motion for a new trial, claiming for the first time that his trial counsel was ineffective for failing to request instruction on reasonable provocation. The same judge who denied the defendant's first new trial motion denied the second motion without a hearing, and the defendant appealed.

b. *The Commonwealth's case.* Principally through the testimony of two men, James Kallelis and Michael Bradley, the Commonwealth described a series of events beginning with a robbery of Kallelis by the defendant, and continuing through a confrontation in which the defendant fatally stabbed the victim, Forrest Hall, in the neck. According to Kallelis and Bradley, at about 10:30 P.M. on January 9, 1991, the defendant and a companion, Marshall Flonory, robbed Kallelis at knifepoint of a twelve-pack of beer, champagne, and eight dollars cash on Franklin Street in Lynn.

Kallelis returned to the apartment he shared with Bradley and reported the robbery to him. Bradley said that he might know who the robbers were and might be able to recover the items. He and Kallelis then left the apartment and walked down Franklin Street. On the way, they encountered Hall, who both Kallelis

---

[1]The defendant was also indicted for armed robbery, but the jury found him not guilty of that charge.

and Bradley knew. Hall was six feet, two inches tall, 190 pounds, muscular, and physically imposing. They told Hall about the robbery and he agreed to "help them out." Hall asked Bradley whether he was carrying any weapons, "because I got nothing either." Bradley replied that he was not, and Hall replied, "Don't worry about it."

In the area of Franklin and Albany streets, the three saw Flonory and the defendant, who Kallelis identified as the person who robbed him. As described by Bradley,[2] he, Hall, and Kallelis approached the defendant and Flonory. Hall stood in front of the defendant and Bradley, to Hall's right, was in front of Flonory; Kallelis stood to the rear behind Hall. The two groups were about one foot apart.

Hall said to Flonory, "What's going on here?" The defendant then reached around Hall and grabbed Kallelis by the jacket. Hall put his left arm out between the defendant and Kallelis and said, "You don't have a problem with him. You deal with me." Hall then unzipped his jacket. In response, the defendant said, "Yo, yo, don't be reaching for nothing." Hall said, "Yo, I'm not reaching for nothing."

Hall resumed talking to Flonory, his head turned toward him. The defendant "was looking up and down Franklin Street." Bradley saw a knife in the defendant's right hand. Bradley reached up to grab Hall's shoulder in order to pull him back because the defendant "obviously was going to stab [Hall]." Bradley then saw the defendant move at Hall from the blind side as Hall's head was turned toward Flonory, stab him once in the neck, and then step back.

Hall put his hand to his neck as blood began shooting out. Hall turned and ran. Bradley and Kallelis ran after him, yelling "Hold on, Forrest, hold on." Bradley turned back to see the defendant and Flonory walking away. Hall ran to a nearby hospital, where he collapsed. Hall died of a single stab wound below his left ear that severed his jugular vein and cut his carotid artery.

Flonory's sister (Darlene) also testified for the Commonwealth. In January, 1991, she lived with Flonory in an apart-

---

[2]Kallelis's testimony was largely consistent with Bradley's, though less detailed.

ment at 118 Franklin Street in Lynn, a block away from the stabbing. At the time of the murder, she and the defendant were dating. He had stayed with her in her room the previous evening.

After the stabbing, the defendant and Flonory went back to the apartment. Darlene overheard Flonory say to the defendant, "You didn't have to do that, man. . . . You got too much Grove Hall in you." Flonory told the defendant, "that was my friend, and you seen, it wasn't like that." Darlene testified that the defendant, who appeared "frightened" and "scared," replied to Flonory, "Well, better him than me. And the guy, you seen him with his hand in his coat." Darlene also testified that her written statement to the police was accurate, which stated that the defendant said, "He opened his coat. He opened his coat and he might have been reaching and I figured [I]'d get him before they got me." As Darlene related, the defendant told Flonory "he was, basically, just trying to defend himself."

The defendant told Darlene that "he stabbed the guy in the neck." She asked why there was no blood on him; he explained that he jumped back "so no blood would get on him," and he demonstrated that movement to her.

c. *The defendant's case.* According to the defendant's version of events, the encounters between the participants began not with a robbery but with an exchange of drugs for beer and wine.[3] The defendant testified that he and Flonory had made a telephone call at a laundromat and were returning to 118 Franklin Street when they encountered Kallelis, who asked Flonory if he had any "blow." Flonory replied that he did not sell cocaine but had some for his personal use. Flonory exchanged some cocaine for Kallelis's wine and beer, and Flonory and the defendant returned to 118 Franklin Street.

The defendant and Flonory later went out to make another telephone call, and as they were returning, the defendant testified that, "[b]efore I could realize, three guys had walked right up on us" and "it was like almost a confrontation as close as we [were]."[4] The defendant did not recognize them; Kallelis was wearing a different jacket.

---

[3]The defendant's alternative version of events was presented largely through his testimony, but his testimony was corroborated by one Russell Warwick, who related what he said Kallelis had told him when both were in jail together.

[4]According to the defendant's testimony, the men yelled to him and he

Hall said to the defendant, "Hey, let me get a twenty." The defendant replied that he did not sell drugs. Hall asked, "Do you know who I am?" and the defendant replied, "No." Hall, who was "yelling in the [defendant's] face," and beating on his chest said, "My name is Wimpy and I run Lynn."[5] The defendant did not reply and Hall asked, "Do you think I'm bullshitting?"

As the defendant testified, Hall "reached in his coat pocket and [] was walking towards me. I pulled out my knife and I stabbed him."[6] Standing only five feet, nine inches tall, he felt nervous as he backed away from the victim and, without thinking or looking, just swung the knife. Though he did not see any object in Hall's hand, he thought Hall "was going to pull out something and hurt" him.

At the time of the stabbing, the defendant "was moving back" and Hall was "coming toward [him]." Kallelis and Bradley, he testified, "stayed put" and did not advance forward. He later told Darlene: "The guy was reaching in his coat and I stabbed him and I jumped back and he was still pulling something out of his coat."[7] The defendant later denied that he consciously jumped back as he stabbed Hall to avoid being hit with his blood, but acknowledged that he showed Darlene how he moved back, explaining the movement as the reason he did not have any of Hall's blood on himself.

When further questioned concerning Darlene's testimony regarding what was said at her apartment following the stabbing, the defendant testified that he said to Flonory, "Well, the guy was going to hurt me. He reached into his coat," but denied that he ever said, "Better him than me."

d. *Instructions.* At the close of the evidence, the trial judge conducted a conference in which he expressed his intention to instruct the jury on both first and second degree murder, and on self-defense. The judge expressed his view, however, that there was little evidence of self-defense. Defense counsel nonetheless

---

stopped and turned around to meet the confrontation, but the three men were not between him (or Flonory) and the apartment at 118 Franklin Street.

[5]There was testimony that Hall was known by the nickname "Wimpy."

[6]The defendant had a knife in his possession, though "for no particular reason."

[7]There was no evidence that Hall was in fact armed.

requested the self-defense instruction and asserted his initial view that the defendant was also entitled to an instruction on manslaughter, arguing heat of passion both as a result of reasonable provocation and excessive force in self-defense.[8] Defense counsel advised that he intended to argue only the theory of self-defense in his closing, however.

The next day, before charging the jury, the judge asked defense counsel whether he wanted him "to give the instruction on manslaughter because of provocation and heat of passion and, also, self-defense." Defense counsel decided to forgo the instruction on heat of passion, stating that, "In my written requests for instructions I included instructions for both of [*sic*] manslaughter as relates to excessive force in self-defense and also as it relates to acting in heat of passion. Upon consideration, I am asking the court not to instruct on manslaughter on a theory of heat and passion [*sic*]. In a final analysis, it may be counter productive to my argument that the defendant acted in self-defense."

In his final argument, counsel proceeded as he had informed the court, arguing to the jury, and concluding, that "your absolute duty on the evidence presented is to acquit Corey Glover by saying he acted in self-defense."

*Discussion.* The defendant relies principally on *Commonwealth* v. *Acevedo*, 446 Mass. 435 (2006), released fourteen years after his trial, arguing that his trial counsel rendered ineffective assistance at his trial by failing to request a jury instruction on reasonable provocation. As the defendant correctly concedes, his claim of ineffective assistance of counsel is waived because he did not raise it at the first opportunity.[9] However, we review even waived claims for a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 295-296 (2002). In order for such a risk to exist, there must first be an error; if an error is found, we then ask " 'if we have a seri-

---

[8]Defense counsel also mentioned sudden combat as a potential instruction, but after a brief discussion, the request was denied. The subsequent discussion between the judge and counsel does not mention sudden combat as one of the potential instructions under heat of passion.

[9]Though his trial counsel represented him on direct appeal, and his failure to raise the claim in that appeal accordingly may be excused, see *Commonwealth* v. *Lanoue*, 409 Mass. 1, 3-4 (1990), his failure to assert the claim in his first new trial motion, when he was represented by new counsel, is not excused.

ous doubt whether the result of the trial might have been different had the error not been made.' " *Commonwealth* v. *Acevedo*, *supra* at 450, quoting from *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999).

"Ineffective assistance of counsel requires behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer, which likely deprived the defendant of an otherwise available, substantial ground of defence. The defendant must demonstrate that better work might have accomplished something material for the defense. A strategic or tactical decision by counsel will not be considered ineffective assistance unless that decision was manifestly unreasonable when made." *Commonwealth* v. *Acevedo*, *supra* at 442 (citations and internal quotation marks omitted).

"Only strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent are manifestly unreasonable." *Commonwealth* v. *Pillai*, 445 Mass. 175, 186-187 (2005) (citation and quotation marks omitted). Furthermore, " '[j]udicial scrutiny of counsel's performance must be highly deferential.' " *Commonwealth* v. *Acevedo*, *supra* at 450, quoting from *Commonwealth* v. *Florentino*, 396 Mass. 689, 690 (1986).

"[A] manslaughter instruction is required if, on any view of the evidence, regardless of the credibility, manslaughter may be found." *Commonwealth* v. *Acevedo*, *supra* at 442-443 (citation and quotation marks omitted). "A jury instruction on reasonable provocation is warranted 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *Acevedo*, *supra* at 443, quoting from *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996).

In the present case, the Commonwealth concedes that the evidence supported instruction on reasonable provocation.[10] Despite the potential viability of the reasonable provocation

_____

[10]Taking the defendant's testimony as true, he was confronted by the physically larger victim and two cohorts; the victim demanded drugs and, when rebuffed, beat his chest, yelled in the defendant's face, and demanded to know whether the defendant knew who he was; he then unzipped his coat, reached

defense, the Commonwealth argues that the present case may be distinguished from *Acevedo* on two grounds. First, unlike in *Acevedo*, trial counsel in the present case made a conscious tactical choice based on the facts to forgo instruction on provocation. Second, the jury in *Acevedo* submitted a question during its deliberation specifically asking whether any grounds other than self-defense could serve as mitigation to a murder charge, *Commonwealth* v. *Acevedo*, *supra* at 450-451, while the jury in the present case asked no such question. We agree that both grounds serve to distinguish this case.

On the issue of trial counsel's decision not to request a provocation instruction, in *Acevedo* the defendant's motion for a new trial also "included an affidavit from trial counsel, who stated that he could not recall, or think of, any tactical reason not to request an instruction on provocation in this case." *Commonwealth* v. *Acevedo*, *supra* at 440. The court concluded that "[a]ssuming that trial counsel's decision not to request a provocation instruction was tactical, . . . it was manifestly unreasonable [because] [t]rial counsel did not pursue an 'all-or-nothing' strategy." *Commonwealth* v. *Acevedo*, *supra* at 447. Rather, the defense counsel's "request for jury instructions on voluntary and involuntary manslaughter indicate[d] that he wanted the jury to have the option of convicting the defendant of the lesser offenses." *Commonwealth* v. *Acevedo*, *supra* at 447.

Conversely, here, trial counsel made a conscious tactical decision not to request the provocation instruction: "Upon reflection, I am asking the court not to instruct on manslaughter on a theory of heat of passion. In a final analysis, it may be counter-productive to my argument that the defendant acted in self-defense." Unlike *Acevedo*, trial counsel, rather than the Commonwealth, requested that the provocation instruction not be given, *Commonwealth* v. *Acevedo*, *supra* at 439, indicating it was the defense strategy at trial.

Trial counsel's statement reveals a conscious tactical decision to adopt a strategy based upon self-defense. Compare *Commonwealth* v. *Mills*, 54 Mass. App. Ct. 552, 555-556 (2002)

in, as though to pull something out, and walked toward the defendant. The defendant felt nervous and scared as he backed away from the victim and, without thinking or looking, swung the knife.

(determination of whether an all-or-nothing defense is reasonable depends in part on whether the record indicates it was the product of a conscious decision). This decision was reasonable, particularly since, unlike *Acevedo*, there was substantial testimony that framed the stabbing as an act of self-defense rather than as the result of provocation. The defendant told others that he was "trying to defend himself," explaining the incident by stating, "He opened his coat and he might have been reaching and I figured [I]'d get him before they got me." Additional testimony indicated that, in the act of stabbing Hall, the defendant had the presence of mind to jump backward in order to avoid being covered with blood (someone acting in the heat of passion may have not had the presence of mind to so act).

Furthermore, unlike *Acevedo*, there was no testimony that anyone struck the defendant prior to him stabbing Hall, making it a much less compelling argument that he "los[t] his self-control in the heat of passion . . . before sufficient time had elapsed for [his] temper to cool." *Commonwealth* v. *Acevedo*, *supra* at 443. While he testified that he was "nervous" during the confrontation, the basis for that fear is much different than the scenario faced by the defendant in *Acevedo*, who was being beaten by several assailants when he stabbed the victim.[11] On the basis of such testimony, defense trial counsel reasonably decided that a provocation instruction "may be counterproductive to my argument that the defendant acted in self-defense."

The court in *Acevedo* noted that while "[s]elf-defense (or excessive force in self-defense) and provocation are not 'mutually exclusive[,]' . . . [t]he theory of self-defense does not 'automatically' incorporate a theory of reasonable provocation; for example, a provocation instruction is not appropriate when a defendant claims to have acted in self-defense but presents no

---

[11]In *Acevedo*, the court noted that reasonable provocation was a viable defense because "[t]he jury could have believed that the defendant reasonably was in fear, but that he did not retreat and therefore lost the right to use self-defense, or that he did not have the right to use deadly force because [the victim] was unarmed." 446 Mass. at 446. Here, the absence of a beating combined with the greater possibility that Hall was armed, alters the calculus. It bears repeating that we are not discussing whether a provocation instruction was warranted but whether it was manifestly unreasonable for trial counsel not to request one.

evidence about his emotional state, or when a defendant argues self-defense but denies experiencing strong feelings of passion, anger, fear, fright, or nervous excitement." *Commonwealth* v. *Acevedo, supra* at 448 (citation omitted). There, the court determined that the theories were consistent, *Commonwealth* v. *Acevedo, supra* at 449, but it did not indicate that this would always be the case. *Ibid.* Compare *Commonwealth* v. *Colon,* 449 Mass. 207, 222 (2007), quoting from *Commonwealth* v. *Vinton,* 432 Mass. 180, 189 (2000) ("A defendant's claim that he acted in self-defense, based on 'asserting the defendant's calculus of survival, not any blindness of heat of passion on reasonable provocation' undercuts his contention that he acted on heat of passion or provocation").

Based on the facts in this case, it was not manifestly unreasonable for trial counsel to focus entirely on self-defense, forgoing both argument and instruction on provocation. "When the arguably reasoned tactical or strategic judgments of a lawyer are called into question, we do not second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty." *Commonwealth* v. *Hurley,* 455 Mass. 53, 70 (2009) (citations and quotation marks omitted).

Additionally, the court in *Acevedo* put significant weight on a detailed jury question[12] regarding other mitigating factors in determining that trial counsel's decision was manifestly unreasonable. "[E]ven were we to conclude that trial counsel's initial decision not to request a provocation instruction was reasonable, it plainly was unreasonable to maintain that strategy when the jury submitted their second question, inquiring whether any mitigating factors other than excessive force in self-defense could eliminate malice." *Commonwealth* v. *Acevedo, supra* at 450.

Here, the only jury question posed regarded reinstruction on self-defense, manslaughter and malice aforethought. The absence of a jury question similar to the one in *Acevedo* on mitigation makes the decision here to forgo a provocation instruction reasonable. Once again, unlike *Acevedo,* counsel continued to

---

[12] "Could you elaborate on malice? Please define all mitigating circumstances which should be considered in deciding malice. In other words, other than excessive force in self-defense, are there any other mitigating circumstances that would eliminate malice?" *Commonwealth* v. *Acevedo, supra* at 440 n.10.

explain his strategy by indicating to the court that "I think when I have come so far saying I don't want heat or [*sic*] passion, I have to go all the way. So I view we are still talking excessive force and self-defense." Both the trial judge and motion judges agreed with that assessment, as do we. The trial judge's retort to counsel's comment was "[t]hat was the basis of the trial, really." In 2009, the motion judge noted in his memorandum of decision that, in response to the jury question requesting reinstruction, "[t]rial counsel wisely did not attempt to switch his course midstream and continued to emphasize self defense as a complete defense or as a mitigating factor."

*Conclusion.* We have to answer the question whether counsel was ineffective in 1992 for not requesting a jury instruction on provocation. Unlike *Acevedo,* decided in 2006, here the jury did not pointedly request other mitigation grounds; also, counsel in *Acevedo* had no recollection of his strategy on this point. In contrast, here we have a thoughtful discussion by the defendant's attorney explaining his tactical decision, both at the original charge stage as well as in response to the jury question. As the motion judge wrote in his memorandum of decision:

> "[T]rial counsel understandably focused on a self-defense claim. After all, the 'better him than me' evidence is much more in line with self-defense than reasonable provocation/ heat of passion. Relying on certain language in the *Acevedo* opinion, the defendant argues that because heat of passion and self-defense factors are so similar, trial counsel 'had everything to gain and nothing to lose pursuing both available theories of voluntary manslaughter.' This reasoning is too facile. The reality is that it is a tactical decision whether to emphasize two theories or focus on the most realistic theory. Some experienced trial counsel might agree that there is 'nothing to lose' by pressing both theories. Other equally experienced trial counsel would opt for arguing only the most promising approach. Neither tactic is 'manifestly unreasonable.' "

Lastly, if counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," one

wonders why different defense counsel in 1998 did not raise the issue.

*Order denying second motion*
*for new trial affirmed.*

GREEN, J. (dissenting). I respectfully dissent, because in my view the present case is largely controlled by *Commonwealth* v. *Acevedo*, 446 Mass. 435 (2006).

While it is true that trial counsel's decision to forgo instruction on provocation was demonstrably tactical in the present case, and less clearly so in *Acevedo*, the distinction does not matter for our purposes unless the choice was reasonable. But *Acevedo* says clearly that the decision to forgo the instruction in circumstances such as these is manifestly unreasonable. "The defendant had nothing to lose — and much to gain — by advocating all available theories of voluntary manslaughter. In fact, provocation well may have been a 'more accommodating' theory for the defendant, as neither self-defense nor excessive force in self-defense would be available if the jury determined that the defendant was not justified in using deadly force against an unarmed person, or that the defendant could have retreated." *Commonwealth* v. *Acevedo*, *supra* at 447-448.[1] Similarly, *Acevedo* flatly rejects the rationale, advanced by trial counsel in the present case to explain his decision to forgo a provocation instruction, that the theory of provocation is somehow "counterproductive" to the theory of self-defense. See *Commonwealth* v. *Acevedo*, *supra* at 448-449.

As for the role of the jury question in *Acevedo*, I consider it to have furnished a rare insight into the struggles faced by that particular jury, and to have lent force to the conclusion that the absence of instruction on provocation might in fact have made a difference. The question posed by the jury in the present case, requesting additional instruction on the definitions of self-

[1]As the majority has observed, see *ante* at 803 n. 7, there was no evidence in the present case that the victim was armed, and the defendant's own testimony established that nothing stood between him and the apartment shared by Flonory and Darlene, which had been his destination before the victim and his companions confronted him.

defense, manslaughter and malice aforethought, is perhaps less indicative of an interest in alternative bases for mitigation. However, both the judge and counsel recognized that the question potentially implicated the alternative basis for manslaughter raised by the evidence, but eschewed by trial counsel's choice.[2] In any event, we are often called upon to assess the effect of error without a clear indication of actual impact of the type revealed by the jury's question in *Acevedo*. In the present case, by acquitting the defendant of armed robbery the jury rejected the Commonwealth's contention that the chain of events began with the defendant's robbery of Kallelis, thereby implicitly crediting the defendant's contention that he and Flonory were suddenly confronted without cause by a group of three individuals, including the substantially larger Hall, and that Hall began beating on his chest in an aggressive and provocational manner. Though I cannot say with confidence that the jury would have returned a verdict of manslaughter based on reasonable provocation if they had been instructed on that theory, I discern no principled basis to conclude that it is any less likely on the evidence than in *Acevedo*. Accordingly, I believe *Acevedo* constrains us to conclude that trial counsel's conscious, but unreasonable, decision to forgo instruction on provocation deprived the defendant of an otherwise available, substantial ground of defense, giving rise to a substantial risk of a miscarriage of justice.

---

[2]While discussing how to respond to the jury's question, the trial judge observed that, were he to get very deeply into manslaughter, "then I think it prejudices the defendant and it prejudices the Commonwealth, because the Commonwealth did not try their case to show lack of provocation, lack of excuse, this type of thing." The trial judge then went on to say that he would exclude from his explanation of manslaughter any discussion of manslaughter arising from a killing committed unlawfully without justification or excuse. It was in response to that comment that trial counsel expressed his intention to continue with his tactical decision: "I think when I have come so far as saying I don't want heat of passion, I have to go all the way."