NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11714


COMMONWEALTH  vs.  JUAN PAGAN.



Middlesex.     January 6, 2015. - June 1, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.




Homicide.  Evidence, Intent, Motive, Age.  Intent.  Mental
     Impairment.  Practice, Criminal, Verdict, Lesser included
     offense, Instructions to jury.  Malice.




     Indictments found and returned in the Superior Court
Department on June 22, 2006.

     The case was tried before S. Jane Haggerty, J.; a motion to
reduce the verdict was heard by her; and a motion for a new
trial, filed on June 13, 2012, was also heard by her.

     The Supreme Judicial Court granted an application for
direct appellate review.


     John F. Palmer for Juan Pagan.
     Bethany Stevens, Assistant District Attorney, for the
Commonwealth.
     Afton M. Templin, for Committee for Public Counsel
Services, amicus curiae, submitted a brief.

HINES, J.  On July 24, 2007, a jury convicted the defendant, Juan Pagan, of murder in the first degree on the theory of deliberate premeditation.  At trial, there was no dispute that the defendant, when he was sixteen years of age, stabbed Alex Castro Santos (victim) to death.  His defense was that he was not guilty of murder because he had acted in self-defense and with a mental impairment, namely attention deficit hyperactivity disorder (ADHD) and depression, which when viewed in the context of his age, caused him to act reflexively and instinctively.  One month following his conviction, the defendant filed a motion pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), to reduce the verdict to murder in the second degree, which the trial judge granted and from which the Commonwealth appeals.  After he was resentenced, the defendant filed a notice of appeal.  Subsequently, on June 13, 2012, the defendant filed a motion for a new trial in the Superior Court, pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), arguing that the court room had been closed during jury empanelment in violation of his right to a public trial under the Sixth Amendment to the United States Constitution.  Following a hearing, a judge denied the motion.[1]  The defendant thereafter filed a separate appeal from

---

[1] The trial judge was also the judge who heard both the motion to reduce the verdict and the motion for a new trial.

this order.  The defendant's direct appeal[2] and his appeal from the denial of his motion for a new trial were consolidated in the Appeals Court, and we granted the Commonwealth's application for direct appellate review.  We affirm the orders allowing a reduction of the verdict to murder in the second degree and denying the defendant's motion for a new trial, and affirm the defendant's conviction.

Trial.  We recite the facts the jury could have found based on the Commonwealth's case, see Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), reserving certain details for our discussion of the specific issues raised.  During the late evening of May 14, 2006, a group of young men in their late teens and early twenties gathered at the apartment of Stephen Peddle in Lowell to socialize and to play cards.  Peddle and some of the men were or had been affiliated with GRIP, a housing program for homeless or displaced youth.[3]  Although not involved with GRIP at the time, the defendant was living with Peddle.

Among those gathered at Peddle's apartment that night were Peddle, the defendant, Michael May, and Ramon Normil.  At around

---

[2] In his direct appeal, the defendant argues reversible error in the judge's failure to instruct on involuntary manslaughter.

[3] In the GRIP program, homeless youths are taught life skills in a group home setting.  Once the youths have acquired these skills and have obtained employment, the organization assists them in finding independent housing.

10:30 P.M., Brian Patrick Murphy, Markeem Bishop, Joshua Spencer Apostolos, and Adam Costas joined them. Approximately twenty minutes later, the victim arrived. He was upset because his friend had been "jumped" by some member or members of a gang. The victim blamed the defendant, Normil, and Peddle for the incident because he suspected they associated with the gang that allegedly had been involved. When asked, Normil informed the victim that he did not know who had participated in the attack. The victim told everyone that friends were looking for members of that gang, implicitly suggesting there would be retaliation. The defendant grew upset, stating that some of those people were his friends.

Having exhausted the last of a "blunt," or marijuana cigarette, Murphy, Costas, Bishop, and the victim left, heading to a nearby convenience store to purchase a cigar.[4] They were gone for about five to ten minutes before returning to Peddle's apartment.[5] When they arrived, the defendant and May were no longer there.

The defendant and May left to visit a friend of the defendant's, Nicholas George Giuliani. On approaching his

---

[4] The victim was not present when some of the men smoked the first blunt.

[5] Joshua Apostolos used the cigar the group purchased to make another blunt that everyone took turns smoking.

automobile,[6] the defendant and May saw that some of the windows had been broken.  The defendant told May that he suspected that the victim had been responsible.

After briefly visiting Giuliani, the defendant and May returned to Peddle's apartment.[7]  The defendant was upset and verbally confronted the victim, who stated that he had had a BB gun earlier, but not anymore.[8]  The victim went on to deny any involvement with breaking the windows of the defendant's vehicle, but stated that he knew who had done it and would not tell the defendant.  The defendant asked the rest of the group whether anyone had seen anything.  No one volunteered information about the incident.  The victim decided to leave and started saying goodbye.  He told the defendant he was "sorry" and it just had been a "joke."  The victim repeated that he was upset about his friend and wanted to go find the perpetrators.  Apostolos, a friend of the victim, testified that the victim

---

[6] The automobile was owned by the defendant's father.

[7] The defendant told Nicholas George Giuliani what had transpired that evening and asked whether Giuliani would accompany him to Stephen Peddle's apartment to "watch his back." Giuliani declined and returned to bed.

[8] There was evidence that Markeem Bishop had a BB gun that "looked like a pistol."  The day prior, "everyone" had played with the BB gun, including the victim.

patted his waist area indicating that he had a weapon.[9]  The defendant asked the victim tauntingly, "Are you ready to use that?"  The victim replied that he was, and the defendant "got quiet."

After taking a cigarette from Normil, the victim headed toward the door, which was in the direction of the defendant, and stood inside the doorway.  The defendant, meanwhile, had taken a seat on a mattress in the living room and had picked up a large combat-style knife with an eight-inch blade and began twirling it.  Murphy testified that the victim walked toward the defendant; Apostolos testified that the victim turned toward the direction of the defendant from the doorway.[10]  The defendant abruptly jumped up from the mattress, stepped around Apostolos, punched the victim three times in the face, and stabbed him in the abdomen.  When Apostolos ran to the victim's aid, he observed a BB gun approximately three to four feet from the victim's body.

---

[9] Brian Patrick Murphy testified that he did not see the victim make any threatening gestures and did not see the victim in possession of any type of gun.  Ramon Normil's testimony was the same.  Although Apostolos observed a BB gun on the floor after the stabbing, he did not see it in the victim's possession, nor did he hear the victim make any threats to the defendant.

[10] The defendant's friend, Michael May, testified that the victim had not approached the defendant just before the stabbing.  Normil stated that the victim was walking toward the door.

Murphy took over assisting the victim, who asked to go to a hospital, and Apostolos restrained the defendant. The knife the defendant had been holding was on the floor.

The defendant fled the apartment and arrived at Giuliani's home at about 1:30 A.M., now May 15. The defendant said that someone had had a gun. He was scared and crying, and told Giuliani that he thought that he had just killed someone and that he had stabbed him. After falling asleep on Giuliani's couch, the defendant awoke to pounding at the front door. Seeing that it was the police, the defendant ran out the back door, but was caught and arrested.

The victim was treated by ambulance personnel at the apartment. He did not survive. The medical examiner who conducted his autopsy opined that the victim died as a result of a stab wound to the abdomen, with perforation of the liver and vena cava.[11]

The police recovered a BB gun outside the rear window of Peddle's apartment. They also took possession of the knife.

The theory of the defense was that the defendant, who was sixteen years of age at the time of the stabbing, did not intend to kill the victim and had acted impulsively or in self-defense.

---

[11] The medical examiner explained that the stab wound had cut the victim's interior vena cava, which is a large vein that carries blood from one's lower extremities to the heart to be reoxygenated.

The defendant did not testify.  He supported his defense with the expert testimony of Dr. Bernice Kelly, a forensic psychologist.  Dr. Kelly interviewed the defendant four times and took note of the fact that he had a very "troubling" childhood involving a mother who abused drugs and a father who physically abused him frequently.  On the basis of her interviews, testing, and review of school, medical, and other records, Dr. Kelly concluded that the defendant suffered from ADHD[12] and dysthymic disorder (depression from an early age) at the time of the stabbing.  She opined that his ADHD exacerbated the impulsivity of an adolescent brain that is prone to risk-taking.[13]  Dr. Kelly testified that in the circumstances the defendant was in just before the stabbing, being an adolescent with ADHD and depression and being in fear of imminent bodily harm, he would not have been able to consider alternative choices and was only capable of acting impulsively.

---

[12] The defendant had been diagnosed with attention deficit hyperactivity disorder (ADHD) when he was in kindergarten.  Dr. Bernice Kelly explained that about seven per cent of the population has ADHD.  She explained that it is "a condition that has to begin before age seven."  Symptoms include hyperactivity, impulsivity, and difficulty with attention, concentration, planning, and problem-solving.  She also cited research that states that the brain undergoes more change during adolescence than at any other time, ending when one is approximately twenty-one years of age.

[13] Dr. Kelly testified that the frontal lobe area of the brain, which controls thinking and planning, and enables one to inhibit responses, is not well developed in adolescents.

The judge instructed the jury on murder in the first degree on a theory of deliberate premeditation, murder in the second degree, and voluntary manslaughter based on reasonable provocation and the use of excessive force in self-defense. The judge also gave an instruction on self-defense as a complete defense. The judge further instructed on the relevance of mental impairment as it bore on the requisite intent to kill, on deliberate premeditation, and on whether the Commonwealth met its burden of proving that the defendant did not act in self-defense, did not act with reasonable provocation, and did not use excessive force in self-defense.

Discussion. 1. Commonwealth's appeal; motion to reduce the verdict. As has been stated, the judge allowed the defendant's motion under rule 25 (b) (2) and reduced the verdict to murder in the second degree. The Commonwealth appeals, seeking reinstatement of the jury's verdict of murder in the first degree. We affirm the judge's order.

The guiding principles for reducing a verdict under rule 25 (b) (2) are set forth in Commonwealth v. Sokphann Chhim, 447 Mass. 370, 381-382 (2006):

> "A trial judge has the authority, pursuant to rule 25 (b) (2), to reduce a verdict, despite the presence of sufficient evidence to support the jury's verdict. . . . Although the purpose of the power to reduce a verdict is to ensure that the result in every case is consonant with justice, . . . the power is to be used sparingly, . . . and the judge is not to sit as a second jury. . . . A most

important consideration is whether the jury verdict is markedly inconsistent with verdicts returned in similar cases. . . . Our role is not to decide whether we would have acted as the trial judge did. The judge has the advantage of face to face evaluation of the witnesses and the evidence at trial and is therefore in a far better position than we[] to make the judgment required by [rule 25 (b) (2)]. . . . We decide only whether the judge abused his discretion or committed other error of law. . . .

"A judge's discretion to reduce a verdict pursuant to rule 25 (b) (2) is appropriately exercised where the weight of the evidence in the case, although technically sufficient to support the jury's verdict, points to a lesser crime. Thus, for example, where evidence of premeditation was slim, the judge did not abuse his discretion in reducing a verdict of murder in the first degree to murder in the second degree. . . . Similarly, where the weight of the evidence suggests that the defendant did not act with malice, a murder verdict may be reduced to manslaughter. . . . We must examine, therefore, whether there was some weakness in the evidence, . . . that the defendant committed murder in the first degree and determine whether the judge was correct in concluding that the evidence is more consistent with a lesser form of homicide." (Quotations and citations omitted.)

In addition, a judge considering a motion to reduce a verdict under rule 25 (b) (2) "may rely on essentially the same considerations as does this court when deciding whether to reduce a verdict to a lesser degree of guilt pursuant to G. L. c. 278, § 33E." Commonwealth v. Reavis, 465 Mass. 875, 891 (2013).

The judge concluded that the weight of the evidence demonstrated a weakness in the Commonwealth's evidence concerning the defendant's ability to deliberately premeditate, thereby pointing to a lesser degree of homicide. She based her

findings on the trial testimony of Dr. Kelly and "the materials presented and argued at the post-trial motion to reduce the verdict, including the report of Dr. Kelly."  The judge's findings of fact were as follows.

At the time of the murder, the defendant was sixteen years of age and suffered from ADHD.  He came from an extremely dysfunctional family.  His mother was drug dependent and had used drugs during her pregnancy with the defendant.  When the defendant was eighteen months old, his mother abandoned the family, and the defendant was in foster care until three years of age.  Although there had been some limited contact with the mother over the years, the defendant essentially had no relationship with his mother.  The defendant's father, who was seventy-four years of age at the time of the murder, provided little parenting or guidance to the defendant, due in part to his age and his own medical problems.  Thus, the defendant had no adult supervision and spent most of his teen years on the streets with peers.  Despite these circumstances, the defendant's juvenile record consisted solely of an assault and battery by means of a dangerous weapon.  That event arose out of an argument that occurred with one member of the defendant's dysfunctional family.

The defendant was diagnosed with ADHD at an early age and was treated with medication for the condition until he was

twelve years of age. Since that time, his ADHD went untreated. In addition to ADHD, the defendant has suffered from untreated clinical depression from early childhood to the time of the murder. His early school years were marked by disruptive behavior and poor performance. In 2004, the defendant's father transferred guardianship of the defendant to his brother in California because the father was incapable of managing the defendant. The brother could not manage the defendant and sent him back to Lowell. In the spring of 2006, the defendant was expelled from Lowell High School. Following the expulsion, the defendant was homeless until he went to live at Peddle's apartment a couple of weeks before the murder.

The judge noted a "constellation of factors at play preceding and at the moment of the stabbing." She found particularly significant that the defendant did not leave to procure a murder weapon (it was already there) and did not seek out the victim.

In addition to the thin evidence of deliberate premeditation, the judge took into consideration the defendant's youth and turbulent background, as well as his medical history. Especially troubling to the judge was the fact that, at the time of the murder, the defendant's ADHD was not being treated. The judge also credited Dr. Kelly's testimony that the defendant lacked the cognitive capacity to premeditate the killing as a

result of his untreated ADHD, inadequate adult supervision, and immature adolescent neurodevelopment. The judge noted that the defendant's impulsiveness not only was affected by untreated ADHD, but also was exacerbated by his youth, familial neglect, and developmental immaturity. She thus determined that a reduction of the verdict to murder in the second degree was more consonant with justice.

As an initial matter, the Commonwealth correctly does not argue that the judge improperly considered the defendant's youth (and adolescent brain) and personal experiences (such as his untreated ADHD and troubled childhood) in reducing the verdict. The judge properly noted that the defendant's age and personal circumstances alone cannot warrant a reduction of the verdict. See Commonwealth v. Rolon, 438 Mass. 808, 825 (2003). The judge, however, considered those factors in combination with the fact that the evidence of deliberate premeditation was slim, a permissible basis on which to reduce the verdict. See id. at 821, 825; Commonwealth v. Ghee, 414 Mass. 313, 322 (1993); Commonwealth v. Millyan, 399 Mass. 171, 188-189 (1987).

The Commonwealth challenges the judge's assessment concerning the evidence of deliberate premeditation and her conclusion that it was weak. The Commonwealth argues that the judge's determination that the defendant's actions reflected more spontaneity than deliberate premeditation, see Commonwealth

v. <u>Tavares</u>, 385 Mass. 140, 158-159, cert. denied, 457 U.S. 1137 (1982) (reducing verdict to murder in second degree in part due to defendant's spontaneous, rather than planned, reaction to victim's alleged insults), was based on a mischaracterization of the sequence of the events preceding the stabbing.  We disagree.

The judge's recitation of the facts correctly acknowledged that Apostolos was the only witness who testified that the victim, before the stabbing, had made a gesture to indicate that he had a gun.  She then went on to say that the defendant next abruptly jumped up from the mattress and stabbed the victim. While the word "next" in her findings did not necessarily exactly describe every witness account, the fact that the victim may have turned first or have spoken with someone about a cigarette before the defendant stabbed the victim, did not detract from the consistent witness testimony that the defendant's actions in jumping up from the mattress to stab the victim were unexpected to everyone there and were abrupt.  There was no evidence to the contrary, and the evidence bearing on the fact that the victim may have indicated that he had a gun or had started walking in the direction of the defendant bore on provocation, self-defense, or excessive use of force in self-defense, but not to the spontaneity of the incident.

The Commonwealth also overlooks the other factors that the judge properly considered, including the fact that any motive on

the part of the defendant to retaliate against the victim for allegedly having broken the windows to the defendant's automobile weakened any suggestion of premeditation when the victim apologized to the defendant. In addition, the knife was already in the apartment and the defendant did not have to leave to obtain it, see Commonwealth v. Keough, 385 Mass. 314, 320-321 (1982), nor did he have to leave to seek out the victim. Further, the defendant inflicted just one stab wound to the victim. See Commonwealth v. Garabedian, 399 Mass. 304, 317 (1987) (consideration in favor of spontaneity, rather than deliberate premeditation, is whether defendant inflicted single blow or separate distinct acts capable of causing death).

The Commonwealth argues that different inferences should have been drawn from this evidence. The judge acknowledged that the evidence was sufficient to support the jury's verdict, but from the evidence and witnesses she heard firsthand, she was not foreclosed from considering the weight of the evidence and doing so in combination with compelling and uncontroverted testimony regarding the defendant's youth, adolescent brain, untreated ADHD, and troubled childhood, which served to mitigate the level of culpability.[14] See Keough, 385 Mass. at 321. The judge's

---

[14] The Commonwealth contends that the judge erroneously relied on Dr. Kelly's testimony to find that the defendant's actions were impulsive and not deliberately premeditated because the evidence "indisputably supports that there was no threat to

decision reflects careful and serious deliberation.  We cannot say that she abused her discretion in determining, based on the facts of this case, that the lesser verdict of murder in the second degree was more consonant with justice.

2.  Defendant's appeal.  a.  Failure to instruct on involuntary manslaughter.  The defendant argues that the judge erred in failing to instruct the jury on involuntary manslaughter based on his mental impairment of ADHD and depression in an adolescent brain.  Because the defendant did not specifically request an involuntary manslaughter instruction on this basis at trial,[15] or object to the charge on the ground of its absence on this basis, we review whether there was error and, if so, whether it created a substantial risk of a

the defendant that night," such that the basis for Dr. Kelly's opinion testimony was unsupported.  Again, the Commonwealth views the evidence only in a light favorable to it.  There was testimony from Murphy that before the stabbing the victim walked toward the defendant.  According to Apostolos, before the stabbing, the victim made a gesture by his waist indicating that he had a gun and told the defendant he was ready to use it.  Just after the stabbing, a BB gun was found on the floor next to the victim.  Viewing the evidence in the light most favorable to the defendant, the jury could have inferred from this evidence that the victim had reached for or had taken out the BB gun just before the stabbing.  This permissible view of the evidence warranted the judge in instructing the jury on provocation, self-defense, and the use of excessive force in self-defense. There was an evidentiary basis for Dr. Kelly's opinion testimony.

[15] The defendant requested an involuntary manslaughter instruction at trial on the basis that the defendant's conduct was reckless.

miscarriage of justice.[16]  See Commonwealth v. Randolph, 438

Mass. 290, 297-298 (2002).  An involuntary manslaughter

instruction is required if the evidence warrants a jury in

finding the defendant guilty of that offense.  Commonwealth

v. Horne, 466 Mass. 440, 444 (2013).  In this case, however,

there was no error because the evidence supported only a finding

of malice, thus precluding an instruction on manslaughter.

"Malice is what distinguishes murder from

manslaughter."  Commonwealth v. Vizcarrondo, 427 Mass. 392, 396

(1998), S.C., 431 Mass. 360 (2000).  The distinction means that

a verdict of manslaughter is possible only in the absence of

malice.  See Commonwealth v. Judge, 420 Mass. 433, 437 (1995)

("Without malice, an unlawful killing can be no more than

manslaughter").  "To prove malice, the Commonwealth must prove

one of three prongs:  (1) an intent to kill the victim; (2) an

intent to cause grievous bodily harm to the victim; or (3)

commission of an act that, in the circumstances known to the

defendant, a reasonable person would have known created a plain

and strong likelihood of death."  Commonwealth v. Riley, 467

Mass. 799, 821-822 (2014).  By contrast, involuntary

manslaughter is "the unintentional result of an act committed

with such disregard of its probable harm to another as to amount

---

[16] We use the substantial risk of a miscarriage of justice standard because we affirm the defendant's conviction of murder in the second degree, not murder in the first degree.

to wanton or reckless conduct."[17] Commonwealth v. Souza, 428 Mass. 478, 492-493 (1998), quoting Commonwealth v. Nichypor, 419 Mass. 209, 217 (1994). In the context of involuntary manslaughter, wanton and reckless conduct[18] is "intentional conduct that create[s] a high degree of likelihood that substantial harm will result to another person." Commonwealth v. Chambers, 465 Mass. 520, 536 n.15 (2013). See Commonwealth v. Horne, 466 Mass. 440, 443 n.2 (2013), and cases cited.

No view of the evidence adduced at trial supports the argument that the defendant's conduct was merely wanton and reckless, and not intentional. The degree of the risk of physical harm that a reasonable person would recognize was created by the defendant's conduct is simply not compatible with the "high degree of likelihood that substantial harm will result to another person" associated with wanton and reckless conduct.

---

[17] "A verdict of involuntary manslaughter is possible only where the defendant caused an unintentional death (1) during the commission of an act amounting to wanton or reckless conduct, or (2) during the commission of a battery." Commonwealth v. Brooks, 422 Mass. 574, 578 (1996). At trial, the defendant argued on the wanton and reckless conduct prong only, conceding that the basis for doing so was "weak."

[18] "This court has described conduct amounting to involuntary manslaughter as both 'wanton or reckless' and 'wanton and reckless.'" Commonwealth v. Tavares, 471 Mass. 430, 437 n.13 (2015), citing Commonwealth v. Chase, 433 Mass. 293, 301 (2001). "Expressed either way, the words articulate a single standard, not two." Tavares, supra, citing Chase, supra.

Here, the defendant had to bypass Apostolos in order to reach the victim and then, after punching him, stabbed him in the abdomen with a knife having an eight-inch blade.  Stabbing someone in the abdomen with an eight-inch blade involves an obvious risk of harm consistent with second or third prong malice and not just a risk of substantial harm that would warrant an involuntary manslaughter instruction. See Commonwealth v. Sanna, 424 Mass. 92, 105 (1997) (when obvious that risk of physical harm to victim created plain and strong likelihood that death will follow, instruction on involuntary manslaughter not required).[19]  Contrast Commonwealth v. Tavares, 471 Mass. 430, 438-439 (2015) (where defendant "simply pointed the gun at [the victim] and then backed away").

The defendant argues that because of his mental impairment, any intent required for murder is vitiated, thus providing a basis for the jury to find him guilty of the lesser included

---

[19] "The difference between the elements of the third prong of malice and wanton and reckless conduct amounting to involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew.  The risk for the purposes of the third of prong malice is that there was a plain and strong likelihood of death . . . .  The risk that will satisfy the standard for wilful and wanton conduct amounting to involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.'" Commonwealth v. Vizcarrondo, 427 Mass. 392, 396 (1998), S.C., 431 Mass. 360 (2000), quoting Commonwealth v. Sires, 413 Mass. 292, 303 n.14 (1992).

offense of involuntary manslaughter. We previously have rejected an argument similar to that advanced here by the defendant involving a defendant's involuntary chemical intoxication. See Commonwealth v. Garabedian, 399 Mass. 304, 315-316 (1987). There, we explained that the issue of involuntary intoxication at the time of the killing "goes to the question of criminal responsibility and not to the issue of involuntary manslaughter." Id. at 316. The same can be said here with evidence of mental impairment. Even if a mental impairment negates malice, a necessary element of murder, a defendant would not be entitled to an instruction on involuntary manslaughter. "A killing without malice aforethought does not automatically constitute involuntary manslaughter." Commonwealth v. Sires, 413 Mass. 292, 302 (1992). Before an instruction on involuntary manslaughter may be given, the defendant would be required to adduce evidence of the "traditional elements" of involuntary manslaughter that the jury might believe. Id. at 302-303. As we have said, no such evidence was presented to the jury.[20]

---

[20] Cases of involuntary manslaughter require proof of intentional wanton or reckless conduct, resulting in an unintentional killing, and not proof of intentional conduct bearing on a specific intent to kill or a specific intent to injure. See Commonwealth v. Walker, 442 Mass. 185, 203 (2004). See Commonwealth v. Welansky, 316 Mass. 383, 398 (1944) ("What must be intended is the conduct, not the resulting harm").

Even if, however, the failure to give the instruction on the basis now argued was error, it was not one likely to have created a substantial risk of a miscarriage of justice. As in Commonwealth v. Tolan, 453 Mass. 634, 650 (2009), the jury "rejected the option of murder in the second degree, the malice element of which comes closest to involuntary manslaughter," namely "an intent to do an act that in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death will result." Id. See Commonwealth v. Novo, 449 Mass. 84, 99 (2007). "In finding the defendant guilty of murder in the first degree [based on deliberate meditation only], the jury necessarily found that the defendant had both a specific intent to kill and that the shooting was premeditated." Tolan, supra. "These findings negate the possibility of involuntary manslaughter." Id. See Commonwealth v. Diaz, 431 Mass. 822, 831 (2000) (conviction of murder in first degree negates claim of prejudice in denying instruction for involuntary manslaughter).

b. Motion for a new trial. We reject the defendant's claim of a public trial violation. The claim was procedurally waived, see Commonwealth v. Jackson, 471 Mass. 262, 268-269 (2015), and no prejudice has been shown to have arisen from the closure. See Commonwealth v. LaChance, 469 Mass. 854, 858-859 (2014). Thus, there also is no merit to the defendant's claim

of ineffective assistance of counsel predicated on defense counsel's failure to object to the closure that occurred.  <u>Id</u>.

Conclusion.  The orders reducing the verdict and denying the defendant's motion for a new trial are affirmed.  The defendant's conviction is affirmed.

<u>So ordered</u>.