NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

20-P-1195

COMMONWEALTH

vs.

PEDRO VASQUEZ.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of murder in the second degree as a lesser included offense of murder in the first degree, illegal possession of a firearm, and illegal possession of a loaded firearm.  On appeal the defendant argues that the trial judge erred by failing to adequately investigate preverdict reports that raised the possibility of racial bias on the part of a juror and by denying the defendant's request for an instruction on involuntary manslaughter.  As we are unpersuaded by these arguments, we affirm the murder conviction. Pursuant to Commonwealth v. Guardado, 491 Mass. 666 (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II), we vacate the

_____

[1] As is our usual practice, we take the spelling of the defendant's name as it appears on the indictments.

convictions of illegal possession of a firearm and illegal possession of a loaded firearm.

Background. 1. The evidence. The defendant and victim dated for several years and at some point were married. Their relationship was volatile. In the summer of 2014, they split up, and the victim moved in with her brother. The defendant, armed with a gun, came to the brother's house and threatened to kill the victim. The couple nonetheless resumed their relationship in the months that followed, but split up again about two weeks before the murder. After this last breakup, the defendant called the victim repeatedly. The victim's son overheard the defendant tell her on one call that, if she did not get back together with him, "You'll see what's going to happen." The victim replied that the defendant needed to move on with his life.

At approximately 5:40 A.M. on January 5, 2015, Springfield police officers responded to a report of shots fired. They discovered the victim slumped over in the driver's seat of a Jeep with her foot on the accelerator. She had died from a single gunshot wound to the head. The bullet had entered the back of her head and exited through the right side of her forehead.

The police located a home security camera nearby and recovered the recording from the homeowner. Shortly into the

2

recording, the Jeep can be seen coming to an abrupt stop across the street. About four minutes later, the rear driver's side door opens, and a man and woman can be heard arguing loudly in Spanish. The Commonwealth offered two witnesses for purposes of translating the audio from Spanish to English, both of whom testified that the woman can be heard saying, "Give me the keys, Pedro." At about five and one-half minutes into the recording, the man is seen getting out of the rear seat of the Jeep. Simultaneously, a gunshot rings out. The man then runs down the street.

Four witnesses who were familiar with both the defendant and the victim identified them as the people speaking on the recording. Three of the witnesses also identified the defendant from the video footage, based on his clothes, height and build, and manner of walking.

2. Dispute between jurors. After thirteen days of trial, the jury began deliberating at about 12:45 P.M. on a Friday; the judge dismissed them just before 4 P.M. Soon thereafter, a court officer informed the judge that he witnessed an argument between juror no. 2 and juror no. 4 outside the jury room. The argument did not concern the case but was more in the nature of, "If you got something to say to me, say it," and then "jarring back and forth." The court officer separated the jurors and sent them on their way.

The argument did not end there, however.  With both the court officer and the prosecutor watching from a window, the jurors confronted each other on the sidewalk outside the courthouse, "kind of face-to-face, going back and forth."  This "went on for a little bit," attracting onlookers.  Eventually, the jurors separated, although juror no. 2 "turned around a few times and said something else."  While the prosecutor could not hear what the jurors were saying, it was clear to him that "they were yelling at each other."

When court resumed the following Tuesday, the judge informed the attorneys that he had received two notes from the jury.  The first note, from juror no. 4, stated:[2]

> "On Friday, February 14th, at 4:15, as I was outside heading through the crosswalk outside of the Court building, Juror number 2 . . . yelled for me as he was coming down the last three steps.  He eventually caught up to me on the sidewalk across the street and continued a confrontation that started during deliberation.
>
> "On the sidewalk, it turned into . . . more than words and moved to threats.  He continued to provoke me and was trying to start a physical altercation, which I began to walk away from.  He got back in front of me when I was near some other gentlemen, who were on the corner.  He called me a racist in front of them and continued to provoke me. . . .  It was now a four-on-one situation of continued threats.  I quickly walked away and was not pursued."

The second note, from the foreperson, stated:

> "During Friday's deliberations . . ., there were multiple times I had to remind a person that needed [sic] to leave

---

[2] We quote from the transcript of the judge's reading of the notes, as the notes themselves are not in the record appendix.

4

his personal feelings out of it.  However, this one had multiple interactions with others, and it became personal between them.  This actually continued outside, after we left.  There seems to be preconceived biases with this juror, which he has voiced to the group.  I will start today . . . with reminding them again about leaving their emotions and personal experiences out of the conversation, but I'm not sure if there is [sic] other steps I need to take, other than your instructions."

After consulting with the attorneys, the judge decided to conduct a voir dire of juror no. 2, juror no. 4, and the foreperson.  Speaking first with juror no. 2, the judge asked him to describe the nature of his dispute with juror no. 4, while cautioning him not to reveal anything about the jury's deliberations.  Juror no. 2 explained that the argument started in the jury room and continued outside the courthouse when he asked juror no. 4 to repeat what he had said inside.  Juror no. 4 reportedly responded, "I read you from day one.  I knew what you were, and you're a piece of shit."  This prompted juror no. 2 to say, "Spoken like a true racist."  When juror no. 4 again called juror no. 2 a "piece of shit," juror no. 2 replied, "Yeah, you're still a racist."

After consulting again with the attorneys,[3] the judge asked juror no. 2 if his dispute with juror no. 4 would interfere with

_____

[3] During this second discussion, the prosecutor reported that he had recently learned that juror no. 2 had prior interactions with the Hampden County District Attorney's Office "that ended negatively."  The prosecutor requested further inquiry into these interactions, which defense counsel opposed.  The judge

5

his ability to be fair and impartial.  Juror no. 2 replied, "Absolutely not," and then, unprompted, provided further details about the dispute, stating among other things:  "I did not assume this gentleman was a racist based on one statement. . . . I mean, there were other statements and incidences within the deliberations. . . .  I came to that conclusion based on a label he gave me during deliberations, in front of everybody."  The judge interrupted at this point and warned again not to reveal anything about the deliberations.  Juror no. 2 apologized and confirmed several times that he could be fair and impartial.

The judge next spoke to juror no. 4.  After cautioning him not to reveal anything about the deliberations, the judge asked him to explain what happened.  Juror no. 4 replied that juror no. 2, whom he described as "kind of volatile," confronted him about something he had said in the jury room, called him a "racist," and tried to provoke a fight.  Juror no. 4 stated that he "wanted no confrontation" and walked away.  When the judge asked whether he had spoken to any of the other jurors about the incident, juror no. 4 said he had not.

At the prosecutor's request, the judge then asked whether the argument had "anything to do with the substance of the case," to which juror no. 4 replied, "Yeah, I would say yes."

---

stated that he would address the issue by asking juror no. 2 if he could be fair and impartial to both parties.

6

The judge did not probe further.  Instead, the judge asked juror no. 4 if he could be fair and impartial despite the argument, and juror no. 4 confirmed that he could.

Last, the judge spoke to the foreperson.  After providing the same warning about not revealing anything about the deliberations, the judge asked the foreperson whether she had witnessed an altercation outside the courthouse.  The foreperson replied that she heard one juror yelling at another juror, "Hey, big man!  We need to have some words," but she witnessed nothing further because she left.  She also stated that there was "tension" in the jury room and described the atmosphere as "uncomfortable."  When the judge asked whether she had spoken to the other jurors about what she observed, the foreperson said she had not and confirmed that she could be fair and impartial.

Once the foreperson stepped back from sidebar, the prosecutor requested that the judge inquire about what she meant in her note by "preconceived biases."  In response defense counsel observed that "one person's personal experience is another's preconceived bias."  The judge then reread the portion of the note about "preconceived biases" and stated, "I think that's her perception.  It might not be accurate."  When the judge indicated that he was "not inclined to intervene as to the internal workings of this group," defense counsel affirmed that he did not want the judge to inquire further of the foreperson.

The prosecutor then requested that both juror no. 2 and juror no. 4 be discharged, stating that there were "accusations of racism and threats of violence occurring in this jury." Defense counsel objected and suggested it would instead be appropriate for the judge to repeat his instructions about the conduct of deliberations. Agreeing with defense counsel's suggestion, the judge brought the jury back to the courtroom and reminded them to approach their deliberations with respect for their fellow jurors, to decide the case based on the evidence, and not to be swayed by prejudice, sympathy, or personal likes or dislikes toward either party. Defense counsel indicated he was satisfied.

The jury resumed their deliberations at 10:20 A.M. and returned their verdicts at 3:22 P.M. the same day.

Discussion. 1. Potential juror bias. When a judge receives a credible preverdict report "that reasonably suggests that a statement reflecting racial, ethnic, or other improper bias was made during jury deliberations," the judge must conduct an inquiry to determine whether the jury remains impartial. Commonwealth v. Ralph R., 490 Mass. 770, 784 (2022). The defendant argues that the inquiry here was inadequate because the judge did not probe into whether racially biased statements were made in the jury room and, if so, whether they infected the

8

jury's deliberations.  The Commonwealth concedes that there was error.

At the time of his inquiry, the judge did not have the benefit of Ralph R., 490 Mass. at 784, which clarifies that, when there is any possibility that statements reflecting improper bias infected jury deliberations, the judge has the duty to ferret out what statements were made and determine whether they affected the jury's impartiality.  The court in Ralph R., supra at 785, concluded that the judge erred by not investigating what a juror meant when she reported "discriminating comments" in the jury room.  The defendant argues that the judge similarly erred here by not exploring the foreperson's report of "preconceived biases"; juror no. 2's report that he believed juror no. 4 was racist based on "statements and incidences within deliberations" and a "label" that juror no. 4 gave him "in front of everybody"; and juror no. 4's report that his dispute with juror no. 2 had to do with the substance of the case.  We agree that under Ralph R. the judge should have delved further into these reports to determine whether racially biased statements were made during deliberations.

We do not agree, however, with the defendant's suggestion that the error automatically entitles him to a new trial.  In Ralph R., 490 Mass. at 786, the court rejected the contention

9

that a judge's failure to investigate a claim of juror bias is a structural error not subject to waiver. As the court explained, "[t]o presume prejudice in this context would ignore the distinction, one long recognized by [the] court, between properly preserved and waived claims." Id., quoting Commonwealth v. LaChance, 469 Mass. 854, 857 (2014), cert. denied, 577 U.S. 922 (2015). Thus, where a defendant fails to object to a judge's failure to investigate, the standard on appeal is whether the error gave rise to a substantial risk of a miscarriage of justice. See Ralph R., supra.

The claim was plainly waived in this case. The defendant did not request that the judge inquire further of juror no. 2 or juror no. 4 and arguably invited the judge not to ask the foreperson what she meant by "preconceived biases." Nor did the defendant request that the judge conduct a voir dire of the other jurors. Instead, the defendant stated he was satisfied with the judge's proposal to repeat some of the instructions and then return the jury to deliberating.

Our review is therefore limited to determining whether there was a substantial risk of a miscarriage of justice. This requires us to consider "the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical

10

decision." Commonwealth v. Azar, 435 Mass. 675, 687 (2002). We will not reverse a conviction under this standard unless "we have a serious doubt whether the result of the trial might have been different had the error not been made." Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).

We see no substantial risk that the error here affected the result of the trial. The Commonwealth's case was strong. The victim was heard on the security recording arguing with a man she called "Pedro," the defendant's first name, moments before he shot her. Numerous witnesses who were familiar with the defendant identified him as the man in the recording. Several of these witnesses testified that they recognized the defendant's voice "right away" and were "sure" and had no doubt that it was him. The defendant also had a motive to commit the murder and had threatened to kill the victim in the past. And importantly, there is no indication that race played any role in this case, whereas Ralph R. revolved around a Black youth's interaction with the Boston police.

Moreover, unlike in Ralph R., where the judge took no steps to determine whether the jury remained impartial, the judge in this case conducted individual inquiries of the jurors involved in the altercation and the foreperson, who witnessed it. All confirmed that they could be fair and impartial. So while we conclude that the judge should have inquired further, the nature

11

of the error was not such that we have serious doubt that the impartiality of the jury was affected. In addition, and again unlike in Ralph R., it appears that defense counsel made a tactical decision not to object, perhaps wishing to protect a juror who had a personal dispute with the prosecutor's office or sensing that a dispute between jurors could advantage the defendant.

For these reasons we conclude that the defendant has not established a substantial risk of a miscarriage of justice on this record. Our ruling does not preclude the defendant from filing a motion to question the jurors under Commonwealth v. Fidler, 377 Mass. 192 (1979), or from raising his claim of juror bias in a motion for a new trial. The Commonwealth acknowledged at oral argument that these remedies remain available to the defendant.

2. Failure to instruct on involuntary manslaughter. "An instruction on involuntary manslaughter is required where any view of the evidence would permit a finding of manslaughter and not murder." Commonwealth v. Pierce, 419 Mass. 28, 33 (1994). "Malice is what distinguishes murder from manslaughter," so "a verdict of manslaughter is possible only in the absence of malice." Commonwealth v. Pagan, 471 Mass. 537, 546, cert. denied, 577 U.S. 1013 (2015), quoting Commonwealth v. Vizcarrondo, 427 Mass. 392, 396 (1998), S.C., 431 Mass. 360

12

(2000).  Thus, "[w]hen it is obvious . . . that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required."  Pierce, supra.

The evidence in this case, viewed in the light most favorable to the defendant, did not support an instruction on involuntary manslaughter.  The evidence was that the defendant shot the victim in the back of the head at close range.  "Absent some evidence that the defendant's knowledge was impaired, intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death" (footnote omitted).  Commonwealth v. Mack, 423 Mass. 288, 290 (1996).  The defendant's appellate argument that he meant only to scare or intimidate the victim is unavailing.  There was no such evidence at trial; the sole issue was the identity of the shooter.  The judge was "not required to instruct on a hypothesis that [was] not supported by the evidence."  Commonwealth v. Santo, 375 Mass. 299, 305-306 (1978).  See Commonwealth v. Pina, 481 Mass. 413, 424 (2019) (defendant's claim that "he meant to fire a warning shot" was "entirely speculative" and did not warrant involuntary manslaughter instruction); Pierce, 419 Mass. at 34 (where defense was alibi and no evidence was offered that victim's wounds were inflicted unintentionally, it would have

13

been error for judge to give involuntary manslaughter instruction).

3. Firearms convictions. After trial in this case, the Supreme Judicial Court held in Guardado I, 491 Mass. at 686-693, that absence of licensure is an element of the offenses of unlawful possession of a firearm and unlawful possession of a loaded firearm. In Guardado II, 493 Mass. at 7-12, the court held that, although the Commonwealth presented insufficient evidence of absence of licensure at the original trial, the prohibition against double jeopardy did not bar a retrial.

After the issuance of Guardado II, the parties filed a joint status report in which they state that the Guardado decisions entitle the defendant to a new trial on his firearms convictions. Upon our independent review, we agree. We therefore vacate the convictions of unlawful possession of a firearm and unlawful possession of a loaded firearm, with the Commonwealth remaining free to retry the defendant if it so chooses. See Guardado II, 493 Mass. at 12.

Conclusion. The judgments of conviction of unlawful possession of a firearm and unlawful possession of a loaded

14

firearm are vacated.  The judgment of conviction of murder in the second degree is affirmed.

So ordered.

By the Court (Wolohojian,
  Shin & Ditkoff, JJ.[4]),

*Joseph F. Stanton*

Clerk

Entered: November 29, 2023.

---

[4] The panelists are listed in order of seniority.