Commonwealth *v.* Vinton.

Commonwealth *vs.* Christopher Vinton.

Worcester. April 7, 2000. - August 1, 2000.

Present: Marshall, C.J., Abrams, Ireland, Spina, & Cowin, JJ.

*Homicide. Practice, Criminal,* Capital case, Assistance of counsel, Instructions to jury, Presumptions and burden of proof. *Constitutional Law,* Assistance of counsel. *Self-Defense. Malice.*

At a murder trial, defense counsel's failure to present asserted corroborative evidence to support a claim of self-defense was unlikely, in the circumstances, to have influenced the jury's verdict and did not create a substantial likelihood of a miscarriage of justice. [183-185]

A decision of defense counsel at a murder trial not to introduce certain photographs or to call certain witnesses, which could have hurt the defense, was not manifestly unreasonable. [185-186]

The decision of defense counsel at a murder trial not to request funds for testing of bloodstains was not manifestly unreasonable where the test results would not have advanced the defense. [186]

At a murder trial, defense counsel's failure to call a police witness, whose testimony was unknown and might have been harmful, to further impeach a prosecution witness did not create a substantial likelihood of a miscarriage of justice. [186-188]

At a murder trial, the judge's misstatement in her instruction on provocation did not create a substantial likelihood of a miscarriage of justice where the evidence did not raise the possibility of provocation. [188-190]

Error, if any, in a judge's instructions to the jury at a murder trial on excessive force in self-defense did not create a substantial risk of a miscarriage of justice. [190-191]

At a murder trial that took place before the decision in *Commonwealth* v. *Jenks*, 426 Mass. 582 (1998), the judge correctly instructed the jury on the three prongs of malice but did not state that only the first prong, specific intent to kill, was relevant to a charge of premeditated murder; no substantial likelihood of a miscarriage of justice arose, however, where the instructions were correct, clear, and emphatic with respect to the purposeful conduct necessary to a finding beyond a reasonable doubt of premeditated murder. [191-193]

Indictment found and returned in the Superior Court Department on September 12, 1996.

The case was tried before *Martha B. Sosman*, J., and motions for a new trial were heard by her.

*Elaine Pourinski* for the defendant.

*Christopher P. Hodgens*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant, Christopher Vinton, appeals from his conviction of murder in the first degree on a theory of deliberate premeditation. The defendant filed a motion for a new trial, pro se; a supplemental motion for a new trial and supporting affidavits were filed by his new appellate counsel. After a nonevidentiary hearing, the trial judge denied the motions. The defendant's appeal from the denials has been consolidated with his direct appeal. He argues that he received ineffective assistance of counsel and that asserted errors in the judge's instructions concerning the burden of proof related to provocation and manslaughter, excessive force in self-defense, and the malice requirement for premeditated murder created a substantial likelihood of a miscarriage of justice. We conclude that the defendant's arguments are unavailing. We see no basis for ordering a new trial or the entry of a verdict of a lesser degree of guilt using our authority pursuant to G. L. c. 278, § 33E. We affirm the conviction and the denial of the motions for a new trial.

1. *Background.* It is undisputed that on August 3, 1996, after receiving a call from Robert Hippert, the defendant went to an apartment to sell him drugs, as he had done on a number of occasions. Hippert, Joseph Jablonski, and the victim, Norman Poulin, were in the apartment that evening. The defendant refused to sell the crack cocaine for less than his asking price of forty dollars, so the victim and the defendant went upstairs to the victim's apartment for the victim to retrieve additional money for the drug purchase. They came back downstairs and an argument ensued, escalating into a physical confrontation in which the victim pinned the defendant against a door or wall. Accounts varied as to what happened next, but no one disputes that the victim died as a result of one stab wound inflicted by the defendant.[1] The defendant claims he acted in self-defense.

Jablonski testified that, when the defendant and the victim came back downstairs, the victim asked Jablonski to come outside with them, they went to the hallway or front door, and

---

[1] The medical examiner who conducted an autopsy determined that the cause of death was a single stab wound that penetrated two inches into the left side of the victim's neck, cutting his external carotid artery, an injury consistent with a knife wound.

the victim pushed the defendant against the outside hallway door. The victim said to Jablonski, "This guy won't give me my money back," complaining that the amount of crack cocaine was too small for forty dollars. Jablonski testified that the victim had his left forearm under the defendant's chin and had keys in his hand that might have had a pen on it. He heard the defendant say, "What are you trying to do, stick me with a knife?", but testified that the defendant did not seem afraid when he said this. To his knowledge, the victim did not try to rob the defendant of any cocaine. According to Jablonski, after a few seconds, the victim let the defendant go. Jablonski and the victim returned to the apartment. About one minute later the defendant knocked on the door, walked up to the victim, swung his arm once at the victim, and stabbed him. Jablonski testified that the victim said, "What did you do? Stab me in the neck?" The defendant responded, "I didn't stab you with anything." The victim started bleeding and Jablonski wrapped a towel around his neck. Hippert's testimony was similar, although he added that the victim may have also slapped the defendant a bit in the initial altercation and stated that the defendant returned to the apartment about five minutes later.

Lisa Bergeron, who was in one of the third-floor apartments in the building that night, offered the following testimony. She knew the defendant by face, having seen him three or four times a day for about two months, and knew his car. That night she saw the defendant go to his car out front, fumble around inside for about thirty seconds, put something on the roof of the car, shut the door, and then get the object from the roof. The defendant went back into the building for four or five minutes and then walked quickly back out to his car.

In contrast to those three witnesses, the defendant offered the following testimony. While upstairs with the victim, he felt that something did not seem right; he went back downstairs and told Hippert he had to leave. Hippert tried to talk him into selling the drugs for less money. As the defendant started to leave, the victim grabbed him, pushed him against the wall, pressed something metal against his throat and told him that if he did not give them the drugs he would cut the defendant. After further struggle, the defendant spit out the drugs he was holding in his mouth, but the victim continued to press "his knife into my throat," and the defendant received "like a slice" on his throat. The defendant, thinking that the victim "was going to

kill [him]," grabbed a knife that was on top of the television and swung it at the victim, then left the house and went to his sister's house. When he got out of his car at his sister's house, he dropped the knife, and testified that he did not know exactly where he dropped it.

2. *Ineffective assistance of counsel.* The defendant argues that he was denied his constitutional right to effective assistance of counsel because his trial counsel failed to present credible corroborative evidence to support the defendant's self-defense claim, failed to have his blood-stained shirt tested, and failed "adequately" to impeach Bergeron — whom the defense describes as the "only apparently unbiased witness."[2] Because this is a case of murder in the first degree, we inquire whether there was any error or serious failure by trial counsel and, if so, whether the error or failure created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Allen,* 430 Mass. 252, 255 (1999). See *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992) ("substantial likelihood" standard for review of ineffective assistance claim is more favorable to defendant than constitutional standard).

The defendant asserts that his trial counsel should have presented corroborative evidence to support the self-defense claim, particularly concerning his testimony that he received "like a slice" from a metal object the victim held against his neck, because the case turned on the credibility of the defendant. He asserts that trial counsel's decision not to introduce photographs of the defendant's neck taken by counsel the day after the victim was killed was manifestly unreasonable,[3] as was the decision not to call any of the seven witnesses who were ready to testify about the injury to the defendant's neck.

---

[2]The defendant also argues that it was error for the judge to deny the motions for a new trial without an evidentiary hearing. A judge may rule on a motion for a new trial without an evidentiary hearing if no substantial issue is raised by the motion or accompanying affidavits. See *Commonwealth* v. *Lopez,* 426 Mass. 657, 663 (1998), quoting *Commonwealth* v. *Stewart,* 383 Mass. 253, 260 (1981); Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). We see no error because no substantial issue was raised by the defendant, particularly concerning the central question of whether he left and then returned prior to the stabbing. See *Commonwealth* v. *Lopez, supra.* See also *Commonwealth* v. *Jenks,* 426 Mass. 582, 586 (1998) ("Ordinarily we defer to the discretion of the trial judge to determine whether an evidentiary hearing is required").

[3]Booking photographs, taken by the police later that same day, were admitted in evidence. These photographs show no injury to the defendant's neck, only a red dot. A police sergeant who saw the defendant approximately twenty-

There is no question that in closing argument the prosecution repeatedly focused on the defendant's claim that his neck was injured by the victim, asserting that the claim was a "bold-faced lie," and that this lie revealed the defendant's lack of credibility concerning the events in the apartment on the night of the stabbing.[4] But defense counsel's own closing argument effectively anticipated and largely preempted the prosecution's closing argument on this point.[5] Moreover, we agree with the judge that the critical question in this trial was whether the defendant had an opportunity to escape and avoid combat.[6] The difficulty for the defendant here is that his credibility concerning whether the victim cut the defendant's neck had little direct bearing on this central issue, whether the defendant left the apartment, went to his car, and then returned to the apartment before stabbing the victim. Even assuming that the failure to put forward the desired corroborative evidence weakened the

---

four hours after the stabbing testified that he "saw no injuries whatsoever on [the defendant's] face or neck area."

[4]In its closing, the prosecution stated:

> "[P]erhaps one of the most important pieces of evidence to come in was the [booking] photographs of the defendant. It's important because it begins to tell you is this defendant telling you the truth when he gets up on that witness stand or is he lying. . . . [T]his jumps out at you as a tremendous aid because it is a photograph or two photographs. And they show his neck. And there is no injury to his neck. So that is a bold-faced lie. He's lying to you. You take that lie and you take it to the rest of the case because he's lying to you about what happened in the apartment, and that's critical . . . . Does the crack dealer take a knife into the house when he goes in . . . ? Of course he does. . . . It doesn't come off the television set. You should lump that together with the cut on [his] neck. . . . Look at that photograph of Mr. Vinton's neck if there is any question in your mind as to who is telling the truth."

[5]In his closing, defense counsel stated:

> "The suggestion may be made by the prosecution, take a look at those photos, the mugshots [showing] that Mr. Vinton wasn't hurt. You don't see marks on his neck. That is not the standard. What the standard is is whether from the defendant's point of view, his self-defense was reasonable, whether he felt that faced with this attack, that what he did was reasonable to defend himself from death or great bodily injury."

[6]The record includes no written memorandum of decision by the judge on the new trial motions, but she expressed her views at the hearing on the motions.

credibility of the defendant generally — an assumption we are not convinced is sound — in the face of testimony from three witnesses that the defendant left and then returned before the stabbing, the failure by counsel to put forward this evidence is unlikely to have influenced the verdict. Consequently, it could not have created a substantial likelihood of a miscarriage of justice, particularly given Bergeron's testimony. In addition to this general problem with the defendant's argument, there are specific problems concerning the particular "corroborative" evidence the defendant argues should have been put forward, as we now examine.

a. *Additional photographs.* The defendant argues that his counsel's decision not to present additional photographs taken by defense counsel of the defendant's neck just before the booking photographs was manifestly unreasonable. As the motion judge correctly observed, however, the photographs were a "double-edged sword" with the "potential to backfire on the defendant," perhaps outraging the jury that a fatal stabbing would be committed "over an injury this minor." It could have been risky to introduce the additional photographs because they showed, as appellate defense counsel characterized it, "a pressure point and a scratch," which the jury could have found was not "like a slice." According to an affidavit of the defendant, his trial counsel stated that the cut "[l]ooked like a cat scratch" in the photographs. The photographs, consequently, could have undermined the defendant's credibility more than they helped him. Trial counsel's tactical decision not to submit the photographs as evidence was not manifestly unreasonable.[7]

b. *Witnesses.* The defendant faults his counsel for not calling any of several witnesses who could have testified that they saw

---

[7]The defendant also argues that trial counsel initially thought the defendant's neck injury was significant enough to photograph and that, if he believed that the photographs did not depict accurately what he himself had observed and did not intend to call others as witnesses who had seen the injury, he should have withdrawn as trial counsel and testified as to his observations. The defendant points to no evidence that the attorney believed that the photographs did not depict the injury accurately. Moreover, counsel had numerous choices for alternative witnesses who saw the defendant when he did and who could have testified concerning the injury or the accuracy of the photographs. The defendant has not shown there was a need for counsel to testify. Cf. *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413, 416-417 (1979) (ineffective assistance of counsel where counsel did not withdraw when need for testimony was apparent; counsel was only alibi witness who could not be impeached by evidence of criminal record).

an injury to his neck. The jury, however, did have before it evidence that the defendant could have received a cut to his neck: the blood on the defendant's shirt collar; Jablonski's testimony that the defendant said, "What are you trying to do, stick me with a knife?," as the victim had keys in his hand; as well as the defendant's own testimony that his neck was cut by the victim. Given the prosecution's focus in closing argument on the defendant's lack of a neck injury, it is arguable that it might have been better for counsel to have called witnesses to support the evidence that the defendant had received a cut or scratch. Counsel's decision not to do so was not manifestly unreasonable. See *Commonwealth* v. *Drumgold*, 423 Mass. 230, 262 (1996) (assessment of defense strategy is not to be made using advantage of hindsight). In any event, the witnesses' testimony would not have directly aided the defendant regarding the central issue whether the defendant left the building before the stabbing occurred. See *Commonwealth* v. *Sarmanian*, 426 Mass. 405, 407-408 (1998) (no error where counsel did not call additional witnesses but evidence from them would have been cumulative, not dispositive).

c. *Testing blood stains.* The defendant states that his trial counsel should have sought court-ordered funds to test the blood on the front collar of his shirt, as the defendant had requested, because proof that the blood was his own would have bolstered his claim that the victim injured his neck. But the defendant concedes that the jury had before them the evidence of blood on the defendant's collar, and the Commonwealth did not argue that the blood was the victim's. Identifying the source of this blood, moreover, would not have helped resolve the central issue on which the defendant's conviction hinged. His attorney's decision not to request funds for the test was not manifestly unreasonable. Cf. *Commonwealth* v. *Conley*, 43 Mass. App. Ct. 385, 395 (1997) (counsel's failure to file motion for blood test of knife manifestly unreasonable where presence of defendant's blood on knife would seriously weaken if not destroy credibility of alleged victims).

d. *Impeachment of Bergeron.* The defendant faults his trial counsel's failure to call the officer who made the report concerning Bergeron's initial statements to the police. In that report Bergeron stated that she "saw this guy leaving the building. He was walking real calm." The report makes no mention of Bergeron's saying, when asked if there was "anything else that you

can think of that would be of help," that she saw the defendant go out to his car and then return to the building. At trial, however, Bergeron testified that she saw the defendant go to his car, get something, return to the building, and come back out four or five minutes later. She testified that the defendant "walk[ed] quickly" to his car and left, spinning and screeching his tires as he did so. The prosecution, in closing, identified Bergeron's testimony on this point as a "piece of critical evidence," and argued that this "going out to the car" prior to returning to the building was "when the real premeditation takes place."

Both Jablonski and Hippert testified that the defendant left after the initial altercation with the victim and then returned to commit the stabbing. But as friends of the victim, with criminal records, who had been drinking that day and were possible participants in the drug deal that led to the altercation, their credibility was not as unassailable as Bergeron's.[8] Impeachment of Bergeron was therefore indisputably important to the defense.

Bergeron *was* impeached by the defense, in a cross-examination that highlighted the inconsistency between her earlier statement to the police and her testimony. In addition, the defense called a private investigator to the stand who testified that he interviewed Bergeron by telephone six days after the stabbing and she did not mention that she saw the defendant leave the house twice. Calling the officer who made the report might have added little to the defense and could have been risky. As the judge observed, it was unclear what the officer would say and whether his testimony would help or harm the defendant. The defense itself recognizes that the officer's testimony "*may* . . . have undermined" Bergeron's credibility. (Emphasis added.) Trial counsel's failure to summon the officer to the stand did not constitute ineffectiveness.[9] Cf. *Commonwealth* v. *White*, 409 Mass. 266, 273-277 (1991) (not inef-

---

[8]Further undermining the credibility of Hippert and Jablonski, there was also some evidence the two had been trying to locate the defendant and were seeking their own form of justice.

[9]The defendant also claims it was "serious inattention" of trial counsel to fail to draw the jury's attention to the video cassette recorder located on top of the television and the fact that its cover was missing. He asserts that it was "arguabl[e]" that the cover was off because it was being worked on by someone, and therefore "plausible" that the defendant could have grabbed a sharp object from there. As the defendant testified that the sharp object he used in the stabbing was a knife, the jury would also have to have believed

fective to fail to call witnesses where any benefit from their testimony would have been largely offset by its harm).

3. *Asserted errors in the jury instructions.* The defendant claims that several errors were made in the judge's instructions to the jury. Because defense counsel did not object at trial to the instructions attacked on appeal,[10] we review the instructions to see if any error created a substantial likelihood that a miscarriage of justice has occurred. See *Commonwealth v. Wright,* 411 Mass. 678, 681 (1992).

a. *Instruction on provocation.* The Commonwealth concedes that the judge's provocation instructions were in error, but argues that the error does not require reversal. We agree with the Commonwealth.

In order to convict the defendant of murder, where the evidence raises the possibility that the defendant may have killed upon reasonable provocation, the prosecution must prove that the defendant did not act upon reasonable provocation. See *Commonwealth v. Whitman,* 430 Mass. 746, 751-752 (2000); *Commonwealth v. Acevedo,* 427 Mass. 714, 716 (1998); *Commonwealth v. Boucher,* 403 Mass. 659, 661 (1989). The judge misstated this burden in portions of her jury instructions.[11] See *Commonwealth v. Acevedo, supra; Commonwealth v. Boucher,*

---

that a knife was the sharp object plausibly left there. The failure of trial counsel to try to draw the jury down such an attenuated chain of inferences was not manifestly unreasonable.

[10]Defense counsel only objected to that portion of the judge's final instruction in the main charge concerning excessive force in self-defense that assertedly implied that the Commonwealth must prove the defendant acted in self-defense, rather than that the Commonwealth must prove that the defendant did not act in self-defense. The judge agreed with the prosecution that she had correctly stated the burden of proof on self-defense many times, and did not repeat the instruction to which the defendant objected. The defendant concedes that there was no objection by trial counsel to that aspect of the excessive force instructions challenged on appeal.

[11]The judge instructed the jury that to prove someone guilty of voluntary manslaughter there must be "proved to you beyond a reasonable doubt" that the defendant injured the victim "as a result of sudden combat or in the heat of passion produced by adequate and reasonable provocation, or by using excessive force in self defense." At least twice in connection with her instructions on malice, however, the judge correctly stated the burden concerning provocation, telling the jury that to "prove malice the prosecution must prove beyond a reasonable doubt that the defendant did not act in the heat of passion and sudden provocation." But the incorrect instructions on the burden regarding provocation were, in essence, given again in the main instructions and yet again in the supplemental instructions. See *Francis v. Franklin,* 471

*supra.* We conclude, however, that because the evidence did not raise the possibility of provocation this error did not create a substantial likelihood of a miscarriage of justice.

"A killing is manslaughter if there is 'provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *LeClair*, 429 Mass. 313, 316 (1999), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). Evidence of heat of passion on reasonable provocation would include evidence "that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980).

The defendant baldly asserts that there was evidence of provocation in this case, but does not point to any specific evidence. In contrast, at trial, the defense argued that the defendant stabbed the victim "in self-defense. He did what he *had to do*," (emphasis added) and that the defendant "tried everything that he could to get out[,] . . . [t]he last thing that he did worked" — that is, stabbing the victim. This argument is based on asserting the defendant's calculus of survival, not any blindness of heat of passion on reasonable provocation. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 721-722 & n.1 (1998) (provocation not "live" issue where trial focused on reasonableness of defendant's belief victim was threatening him, force used and failure to retreat, not provocation). In his testimony, the defendant indeed denied being in a rage or having any desire to "get back at" the victim when he acted.

The defendant did testify that he was "scared" due to the victim's acts and threats during the altercation, which, if the stabbing had occurred during the altercation, might have raised the issue of provocation. See *Commonwealth* v. *Walden, supra.* It seems obvious from the jury's conviction of premeditated murder, however, that they did not conclude the stabbing was during the initial altercation, but sometime thereafter during a

---

U.S. 307, 322 (1985) ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity").

return to the building by the defendant.[12] None of the testimony concerning the defendant's return to the building raises an issue of reasonable provocation. Bergeron testified merely that the defendant fumbled through his car, got something, closed the door to his car, and then went back in. Jablonski testified that the defendant knocked at the apartment door, came in when invited in, said, "We got to talk," then walked up to the victim and stabbed him. Hippert's testimony was almost identical to Jablonski's on this point. We do not see in this any evidence raising the issue of provocation. See *Commonwealth* v. *Roderick*, 429 Mass. 271, 278-279 (1999). The judge's flawed instructions on provocation did not create a substantial likelihood of a miscarriage of justice. Cf. *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715 (1998) (error in provocation instructions on burden of proof prejudicial in murder conviction where provocation issue plainly presented by evidence; defendant shot victim while victim was pursuing him with baseball bat).

b. *Instruction on excessive force in self-defense.* The defendant challenges the judge's instruction on excessive force in self-defense, pointing to her instruction that

> "another factor or circumstance which mitigates or reduces murder to manslaughter is when a person kills someone using excessive force in self-defense. If the Commonwealth has proved to you that the defendant used excessive force and that the defendant was not acting in valid self-defense, but the use of excessive force under the circumstances reduces the crime to manslaughter. A person in fear of imminent injury or death who uses excessive force to defend himself, would be acting under a form of provocation, and that would reduce the crime from murder to manslaughter."[13]

---

[12]We note that if the jury did believe the defendant's version of events, that he stabbed the victim during the initial altercation, the facts that would have raised the possibility of reasonable provocation also would have raised the question of self-defense. Yet the jury neither acquitted, as they would have if they believed valid self-defense with reasonable, not excessive, force was involved, nor rendered a verdict of voluntary manslaughter, as they would have if they believed self-defense with excessive force was involved. The jury's failure to render either of these verdicts further indicates they did not believe the defendant's version of events.

[13]In supplemental instructions, the judge repeated this formulation in very

The defendant complains that "[i]t is unlikely that the jurors thought that imminent injury or death meant anything other than serious bodily injury [or death]" because of the judge's use of that phrase in her instruction concerning self-defense. The defendant appears to argue that the instruction challenged here improperly limited the type of self-defense to which excessive force self-defense mitigation could be applied to that where the defendant was in fear of imminent serious bodily injury or death. Consequently, the jury would have been improperly precluded from mitigating the crime to manslaughter if they believed that the defendant had a reasonable fear of physical harm or attack, but did not believe that he had a fear of imminent death or serious bodily injury.

The short answer to this argument is that the judge did not frame self-defense in terms of a response to serious bodily injury or death, but rather in terms of a response simply to imminent "injury or death." We do not agree that the jurors would have likely thought otherwise. Moreover, the judge repeatedly discussed self-defense broadly, in terms of the right of a person to "defend himself from physical attack," and did not limit the general right of self-defense to those circumstances where the defendant reasonably believes he is in imminent danger of serious injury or death.[14] Thus, when the judge later said that "in considering whether any force used in self-defense was reasonable or whether it was excessive" one is to consider all the surrounding circumstances, the jury would have had as its starting point in the assessment of reasonableness the right to defend oneself against physical attack. Viewing the instructions as a whole, the phrasing complained of by the defendant did not create a substantial likelihood of a miscarriage of justice.

c. *Instruction on malice for murder in the first degree by means of deliberate premeditation.* The defendant challenges the judge's failure to instruct the jury that they must find "first prong malice" in order to find the defendant guilty of murder by means of deliberate premeditation. We explained, in *Commonwealth* v. *Jenks*, 426 Mass. 582 (1998), a decision that

---

similar terms, although she made this central point perhaps more clearly by saying, "If the Commonwealth has proved that excessive force was used, then the defendant was not acting in valid self-defense. But the use of excessive force under the circumstances would reduce the crime to manslaughter."

[14]The judge did use the phrase "imminent danger of death or serious bodily injury" when explaining the circumstances in which a defendant would be justified in using deadly force to defend himself.

postdated this trial,[15] "that it is better to make clear to the jury that 'murder in the first degree by reason of deliberate premeditation relates only to the first prong of malice.' " *Id.* at 585, quoting *Commonwealth* v. *Diaz*, 426 Mass. 548, 553 (1998). See *Commonwealth* v. *Carlino*, 429 Mass. 692, 697 (1999). But we concluded in *Jenks* that, even if the judge included instructions on second and third prong malice in such a case, there was not a substantial likelihood of a miscarriage of justice where the "judge's instruction on deliberate premeditation was correct, clear and emphatic, so that 'a reasonable juror could only have understood that a guilty verdict . . . by reason of deliberate premeditation required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill.' " *Commonwealth* v. *Jenks*, *supra* at 585, quoting *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997).

Here, the judge correctly defined the three prongs of malice, but did not state that only the first prong, specific intent to kill, is relevant to a charge of premeditated murder. See *Commonwealth* v. *Jenks*, *supra* at 585. The judge clearly stated to the jury, however, that in order to convict the defendant of murder in the first degree, the prosecution "must prove one additional element, that is, it must prove beyond a reasonable doubt that the murder was committed with deliberate premeditation . . . that the defendant thought before he acted[,] . . . formed a plan to murder after deliberation."[16] She repeated this formulation in her supplemental instructions. She instructed the jury at least six times in the main charge that a conviction of murder in the first degree requires proof of deliberate premeditation and at least five times in her supplemental instructions. The instructions, read as a whole, were "correct, clear and emphatic" regarding the proof of deliberate premeditation required for this conviction. *Commonwealth* v. *Jenks*, *supra.*

[15]The trial took place in April and May, 1997.

[16]The defendant takes issue with the judge's use of the phrase "plan to murder," arguing that it left the impression that any one of the prongs of malice satisfied the requirement for murder in the first degree by means of deliberate premeditation. To the contrary, we think a reasonable juror would have interpreted this phrase as conveying a specific intent to kill. See, e.g., *Commonwealth* v. *Williams*, 422 Mass. 111, 122 (1996) (discussing "plan to murder" formed within few seconds as sufficient to meet period of reflection needed for deliberately premeditated murder).

See *Commonwealth* v. *Jiles*, 428 Mass. 66, 71 (1998); *Commonwealth* v. *Gibson*, 424 Mass. 242, 246-247 (1997).

4. *Relief pursuant to § 33E.* The defendant argues that this court should exercise its authority under G. L. c. 278, § 33E, to order a new trial or to reduce the defendant's conviction to manslaughter, based on the errors and ineffectiveness of counsel discussed above. The defendant further argues that he voluntarily turned himself in to the police and there was no indication he had been violent in the past or went to the apartment with any intent to harm anyone. For the reasons discussed above, and because justice does not require it, we decline to order a new trial or reduce the conviction. See *Commonwealth* v. *Garabedian*, 399 Mass. 304, 318-323 (1987) (refusing to reduce verdict or order new trial under § 33E even though it might have been true defendant did not go to crime scene with intent to murder); *Commonwealth* v. *Whipple*, 377 Mass. 709, 715 (1979) (we have regularly denied § 33E relief where defendant, party to a dispute, leaves the scene, procures weapon, and returns to do murderous work). Cf. *Commonwealth* v. *Maskell*, 403 Mass. 111, 116-117 (1988) (reducing verdict from murder to manslaughter pursuant to § 33E where defendant was first shot by victim, and was in deadly fear and in excruciating pain from wound when he shot victim less than one minute later). We affirm the defendant's conviction and the denial of his motions for a new trial.

*So ordered.*