NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1092

COMMONWEALTH

vs.

MICHAEL BRAWNER.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In 2017, the defendant was indicted for murder in the first degree (count one), illegal possession of a firearm (count two), and unlawful possession of ammunition (counts three and four).  A jury found him not guilty of murder in the first degree but guilty of the lesser included offense of murder in the second degree.  The jury also convicted him of illegal firearm possession, and both counts of unlawful possession of ammunition.[1]  The defendant appeals from his convictions and from

_____

[1] A fifth count, trafficking in thirty-six grams or more of cocaine, was severed from the other charges.  After the defendant's motion to reduce his conviction of murder in the second degree was denied, the defendant entered an Alford plea to so much of count five as charged trafficking in eighteen grams or more of cocaine.  See North Carolina v. Alford, 400 U.S. 25 (1970).

the judge's denial of his motion for a new trial or to reduce the jury's verdict from murder in the second degree to voluntary manslaughter.  We affirm the defendant's conviction for second-degree murder and the denial of his motion for a new trial or to reduce the verdict.  We vacate the defendant's firearm and ammunition convictions and remand for further proceedings consistent with this memorandum and order.

Background.  In light of the defendant's challenge to the sufficiency of the Commonwealth's evidence to disprove mitigating circumstances as to the murder conviction, we recite the facts in the "light most favorable to the prosecution," reserving some details for the discussion.  Commonwealth v. Grassie, 476 Mass. 202, 207 (2017), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979) (discussing review standard utilized to assess sufficiency of evidence to disprove mitigation).

In February 2017, the defendant was dating Sorheyddi Colondres.  He lived with her and her daughter, Daviana Pinckney.

On February 9, 2017, Pinckney's father, Kevin Blanton, picked her up from school and brought her to his home.  Around 8 or 9 P.M., Colondres began sending Pinckney angry text messages

and calling her because she did not come home that evening. Pinckney explained to Colondres that she could not come home that night because there was a snowstorm and Blanton's car battery had died. Colondres also sent Blanton text messages that we set forth in greater detail in the discussion.

Around 1 A.M., Colondres and the defendant drove to Blanton's home. While the defendant waited in the car, Colondres banged on the home's door, screaming, "Get my daughter. Get my daughter." The commotion woke up Pinckney as well as Blanton's girlfriend, Jennifer Fajardo. When Blanton opened the door, Colondres stormed into the house, yelling for her daughter. Blanton told Colondres to be quiet, that Pinckney was asleep, and that he would bring her home in the morning. Colondres continued yelling and demanding to see Pinckney. At that point, Blanton grabbed a long metal flashlight and went outside.

A couple of seconds later, Fajardo heard Blanton say, "Come get your girl." Pinckney and Fajardo then heard a loud bang. Fajardo ran outside, followed by Colondres and Pinckney. Outside, Fajardo saw the defendant on top of Blanton in the snow. The defendant had a gun in his right hand. Blanton said, "He shot me. He shot me," to Fajardo, and then, "You shot me," to the defendant. Blanton continued, "be careful. He has a gun." Pinckney then said, "You shot my dad?" to the defendant,

3

who shook his head side-to-side in response. With the defendant still on top of him, Blanton angrily said, "He's trying to shoot me again."

After a struggle, the defendant got off of Blanton. The defendant then got into the car he had arrived in, as Fajardo helped Blanton off the ground. Colondres forced Pinckney into the car and they, along with the defendant, drove off. We reserve discussion of what was said in the car.

Fajardo ran inside to call 911 as Blanton made his way back to the house. By the time police arrived, Blanton had died of the gunshot wound to his right chest.

At the scene, police found a handgun in the snow where the struggle occurred and a single .45 caliber shell casing. The gun's magazine contained five bullets with another in the chamber, all of which were Winchester brand .45 caliber. No fingerprints were detected on the gun, magazine, live rounds, or casing and DNA testing of those items yielded inconclusive results. Police also recovered a bloody flashlight in the alley leading to the kitchen door of Blanton's home. Police did not find a firearm or ammunition inside Blanton's home and Fajardo testified that she never saw either in the house.

Around 8 A.M., police arrived at the defendant's home. When first questioned by police, the defendant said that he had been home all night. The defendant later told police that he

4

had left the house a couple of times that evening, but did not remember with whom he had been or what car he drove. In the bedroom where they found the defendant, inside a safe, police found several kinds of ammunition, including sixteen .45-caliber rounds stamped "Winchester 45 auto" that were consistent in size, shape, and full-metal-jacket brass casing configuration with those found in the weapon recovered at the scene. Police also seized the defendant's cell phone and later extracted its data.

Discussion. 1. Motion to reduce the verdict. The defendant first challenges the trial judge's order denying his motion to reduce the verdict of second-degree murder to voluntary manslaughter, arguing that the Commonwealth failed to disprove the three theories of mitigation -- excessive force in self-defense, heat of passion on reasonable provocation, and heat of passion induced by sudden combat. See Commonwealth v. Roman, 495 Mass. 412, 428 (2025) (mitigating circumstances). "Under rule 25 (b) (2), a trial judge has broad authority to reduce a jury's verdict, despite the presence of legally sufficient evidence to support it." Grassie, 476 Mass. at 214. "The role of this court in reviewing a trial judge's ruling on a motion to reduce the verdict is 'not to decide whether we would have acted as the trial judge did.'" Id., quoting Commonwealth v. Chhim, 447 Mass. 370, 381 (2006). "Instead, we decide only

5

whether the judge abused his or her discretion or committed an error of law."[2] Grassie, supra at 214. "Abuse of discretion arises where 'the judge made "a clear error of judgment in weighing" the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'" Id., quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

In the light most favorable to the Commonwealth, the evidence showed that the defendant arrived at the victim's house armed with a loaded gun, left the safety of the car in which he was sitting to confront the victim, and, without any provocation from the victim, attacked and shot him. This evidence disproved all three of the potential mitigating circumstances listed above. See Roman, 495 Mass. at 431, quoting Grassie, 476 Mass. at 210 (self-defense not available where defendant "did not use or attempt to use all proper and reasonable means in the circumstances to avoid physical combat before resorting to the

---

[2] The defendant's reliance on Commonwealth v. Vargas, 475 Mass. 338 (2016), is misplaced. In Vargas, the Supreme Judicial Court reduced a first-degree verdict to voluntary manslaughter using its "extraordinary authority under G. L. c. 278, § 33E." Vargas, supra at 363. See id. at 366. However, this court does not have authority under § 33E, which is "given to the Supreme Judicial Court alone." Commonwealth v. Riva, 18 Mass. App. Ct. 713, 719 (1984). Instead, our review is focused on whether the motion judge abused his discretion by not reducing the verdict. See id. See also Grassie, 476 Mass. at 214.

use of deadly force"); Commonwealth v. Miranda, 492 Mass. 301, 307 (2023) ("The victim making physical contact with the defendant is necessary" to establish mutual combat); Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006), quoting Commonwealth v. Walden, 380 Mass. 724, 728 (1980) ("Reasonable provocation is provocation that 'would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint'"). That the defendant offered countervailing evidence does not change our analysis; the jury was entitled to discredit the defendant's evidence suggesting mitigating factors and self-defense. Commonwealth v. Ronchi, 491 Mass. 284, 294 (2023) ("The jury reasonably could have adopted the Commonwealth's theory that the defendant got into a heated argument with his girlfriend, formed an intent to kill her and her fetus, and stabbed her multiple times in the area of her vital organs, in accordance with that plan"). We discern no abuse of discretion on the part of the motion judge in declining to reduce the conviction to voluntary manslaughter.

2. Ineffective assistance of counsel. "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's behavior fell measurably below that of an ordinary fallible lawyer and that he was prejudiced as a result." Commonwealth v. Domino, 465 Mass. 569, 577 (2013),

citing Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  "A strategic or tactical decision by counsel will not be considered ineffective assistance unless that decision was 'manifestly unreasonable' when made."  Acevedo, 446 Mass. at 442, quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978).  "In making this determination, we evaluate the decision at the time it was made, and make 'every effort . . . to eliminate the distorting effects of hindsight.'"  Commonwealth v. Glover, 459 Mass. 836, 843 (2011), quoting Commonwealth v. Fenton F., 442 Mass. 31, 38 (2004).

The defendant argues that his trial counsel provided ineffective assistance of counsel in four ways.  We address each in turn.

a.  Involuntary manslaughter instruction.  The defendant argues that where the jury heard evidence that could have supported a finding that the defendant did not intentionally shoot the defendant, but did so only because the gun inadvertently discharged, trial counsel should have requested an instruction on involuntary manslaughter.[3]  Because we are not persuaded that the defendant was entitled to that instruction,

---

[3] Trial counsel averred that he did not "recall if [he] consciously thought about" requesting an involuntary manslaughter instruction but, in retrospect, "still [did] not see that the case presented a factual scenario under which involuntary manslaughter was a plausible verdict."

8

the defendant's argument fails on the first prong of the Saferian test.

"Involuntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." Commonwealth v. Ridley, 491 Mass. 321, 330 (2023), quoting Commonwealth v. Lopez, 485 Mass. 471, 484 (2020). "An involuntary manslaughter instruction is required if the evidence warrants a jury in finding the defendant guilty of that offense." Commonwealth v. Pagan, 471 Mass. 537, 546, cert. denied, 577 U.S. 1013 (2015).

Here, the defendant's actions were not merely wanton or reckless. See Pagan, 471 Mass. at 547. The defendant brought the gun to the altercation, he was uninjured, and, at close range, he shot Blanton in the chest near his heart. See id. at 546-547 (malice may be proved by evidence of defendant's "commission of an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood of death" [quotation omitted]). The defendant's actions in this case posed an "obvious risk of harm" to Blanton, consistent with malice. Id. at 547 (involuntary manslaughter instruction not warranted where the defendant stabbed the victim with an eight-inch blade, posing an "obvious

9

risk of harm consistent with second or third prong malice").[4]
Therefore, trial counsel's failure to request an involuntary
manslaughter instruction was not "manifestly unreasonable."
Adams, 374 Mass. at 728.

   b.  Failure to introduce evidence of Blanton's motive and
disposition.  The defendant argues that trial counsel provided
ineffective assistance of counsel for failing to introduce
evidence showing that Blanton was angry with him leading up to
the incident.  This included evidence that Pinckney told Blanton
the night of the incident that she "felt disrespected" by
something the defendant had said and that the defendant "called
[Blanton], like, out his name," and that Pinckney told the
police that Blanton was "mad that [the defendant] disrespected
[her]," as well as evidence of a text message from Blanton to
Colondres, which read:

> "You got this bitch ass nigga back in the house and got the
> nerve to be arguing with my daughter and speaking on me.

---

[4] Moreover, an involuntary manslaughter instruction would
have been inconsistent with the defense's trial strategy.  See
Commonwealth v. Barbosa, 463 Mass. 116, 135 (2012).  At trial,
the defense pursued the theory that Blanton brought the gun.  It
would have been "tactically awkward" to request an involuntary
manslaughter instruction, which would have asked the jury to
conclude that the defendant brought the gun instead.  Id. (where
"the primary defense was misidentification," an alternative
theory of manslaughter was not warranted), quoting Commonwealth
v. Donlan, 436 Mass. 329, 333-334 (2002).  See Donlan, supra
(where the "primary defense at trial was that no sexual contact
had occurred," failure to request a lesser included instruction
of rape was not manifestly unreasonable).

10

That clown don't know me . . . yet. You a pitiful bitch and him too. You ain't wanna tell me that for real, fuck you."

To the extent that trial counsel opted not to introduce this evidence, his decision was not "manifestly unreasonable," Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), quoting Acevedo, 446 Mass. at 442, and thus did not fall below accepted standards of practice.

i. Pinkney's statements. Although Pinckney's statement that Blanton was "mad that [the defendant] disrespected [her]" could have been used to impeach her testimony at trial that Blanton "didn't seem upset" or "appear angry" that night after texting Colondres, it would not have been admissible to prove Blanton's state of mind. See, e.g., Commonwealth v. Brum, 492 Mass. 581, 587-588 (2023) (prior inconsistent statements must have been "made under oath before a grand jury" to be substantively admissible).

Moreover, Pinckney's statements and Blanton's text message would have been a "double-edged sword" for the defense. Commonwealth v. Vinton, 432 Mass. 180, 185 (2000) (holding that it was not manifestly unreasonable for trial counsel to not submit photographs to corroborate defendant's testimony where they were a "double-edged sword with the potential to backfire on the defendant" [quotation omitted]). See Commonwealth v. Robinson, 493 Mass. 775, 791-792 (2024) (holding that trial

11

counsel's decision to not call an eyewitness identification expert was not manifestly unreasonable where the testimony would have "cut both ways").  Although this evidence could have shown that Blanton was angry with the defendant that night, it also would have shown that the defendant had a reason to act violently toward Blanton.

ii.  Blanton's text messages.  Introducing Blanton's text message to Colondres would have risked the admission of their subsequent text exchange under the doctrine of verbal completeness.  See Commonwealth v. Amaral, 482 Mass. 496, 503-504 (2019) ("[W]hen a party introduces a portion of a statement, a judge has discretion to allow admission of other relevant portions of the same statement or writing which serve to clarify the context of the admitted portion" [quotation and citation omitted]).  Because the related texts between Colondres and Blanton not only provided evidence of Colondres's threats to have the defendant take her to Blanton's home if Blanton did not return Pinkney to Colondres that night,[5] but also showed Blanton's attempts to deescalate the argument,[6] they suggested

_____

[5] Colondres's texts included the message, "This will be the last day u ever see ur daughter dead beat," and "bring my daughter or Imma have [the defendant] take me up to you home."

[6] First, following multiple texts from Colondres, Blanton responded that "I'm sending her to sleep and im takin her phone. It's her bedtime.  Knock if you want or wait that's it gn." Colondres continued to text and Blanton attempted to block her.

12

that Blanton was cooling off from the initial upset of what Pinckney told him, this evidence was a "double-edged sword."  It was not manifestly unreasonable for trial counsel to not introduce it.  See Robinson, 493 Mass. at 791-792; Vinton, 432 Mass. at 185.

c.  Failure to impeach Pinckney's testimony.  The defendant argues that trial counsel provided ineffective assistance of counsel when his cross-examination of Pinckney introduced an otherwise inadmissible prior consistent statement.

At trial, Pinckney testified that during the car ride after the incident, the defendant said, "your dad came at me with a flashlight," which supported the Commonwealth's argument that Blanton did not bring the gun.  On cross-examination, trial counsel attempted to impeach Pinckney, asking, "Did you ever tell the police that you told them that . . . Mr. Blanton came out with a flashlight?"  Pinckney responded, "Have I ever told the police that?"  When trial counsel said, "Yes," Pinckney answered, "Yes, sir."  Trial counsel then asked if she made the statement in her first two police interviews.  The prosecutor

When Colondres's texts continued to come through, Blanton then said, "I don't know how you still texting me.  Leave [Daviana] alone she has school in the am.  She see you tomorrow it's a storm don't be mad at her you wrong but you can't even admit it. You letting a bitch nigga make you look stupid to your baby smh."

13

interjected in front of the jury to say, "the Commonwealth would stipulate that particular statement isn't made in the first two statements of Ms. Pinckney . . . [b]ut, only the first two statements" (emphasis added).

After the judge asked for clarification, the prosecutor said, again in front of the jury: "Defense counsel is asking Ms. Pinckney if she had mentioned the defendant's statement of, Your father came at me with a flashlight, in the two initial statements that she gave. The Commonwealth is willing to stipulate that she did not make that statement in the first two statements that she gave" (emphasis added). Counsel did not elicit that in her first police interview, Pinckney said the car ride after the incident was "completely silent" and that the defendant "didn't really say anything."

"[F]ailure to use particular methods of impeachment at trial rarely rises to the level of ineffective assistance of counsel" (citation omitted). Commonwealth v. Goitia, 480 Mass. 763, 770 (2018). "Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will . . . show deference." Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). "Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a

14

different approach to impeachment would likely have affected the jury's conclusion." Id.

Here, trial counsel's cross-examination did not constitute ineffective assistance of counsel. The cross-examination made the jury aware of the salient point: that Pinckney did not relay the flashlight comment in her first two police interviews. See Fisher, 433 Mass. at 357 (counsel not ineffective where counsel impeached the witness with the different versions of events he had given). This would have allowed the jury to question Pinckney's credibility.

In any event, it is unlikely that a different approach would have achieved a better result for the defendant. The flashlight comment was just one piece of evidence supporting the Commonwealth's argument that the defendant, not Blanton, brought the gun. As discussed, the evidence showed that the defendant had the same ammunition as the kind found on the scene and that he was found on top of Blanton with the firearm in his hand. Blanton was not prejudiced by trial counsel's cross-examination. See Commonwealth v. Marinho, 464 Mass. 115, 128 (2013) (even where counsel provided ineffective assistance, the defendant must "show that he was prejudiced by counsel's performance").

d. Failure to introduce corroborating evidence of the defendant's challenged testimony. At trial, the defendant testified that he was on the phone with a woman, Quadeshia Sims,

15

as the victim approached the car.  He argues that his counsel was ineffective for failing to interview Sims, who the defendant says was in his telephone as "Deja,"[7] and introduce supportive evidence from the cell phone records.

i.  Failure to interview Sims.  Trial counsel had a duty "to conduct an independent investigation of the facts." Commonwealth v. Baker, 440 Mass. 519, 529 (2003).  Here, the only evidence that the defendant told trial counsel about Sims comes from his own posttrial affidavit, which the judge was entitled to discredit as self-serving.  See Marinho, 464 Mass. at 123 ("[A] judge is entitled to discredit affidavits he or she does not find credible"); Commonwealth v. Denis, 442 Mass. 617, 633-634 (2004).  Similarly, the judge was entitled to credit trial counsel's affidavit that he did not remember the defendant mentioning Sims and that he would have investigated further had he known about her.  See Marinho, 464 Mass. at 123.

Assuming that counsel was aware of the defendant's claim to have been talking to Sims moments before the shooting, we are unpersuaded that trial counsel's failure to investigate the defendant's account, or to call Sims to testify at trial, fell below accepted standards.  This is because the call log section

---

[7] The Commonwealth disputes whether "Deja" was Sims.  In any event, after trial, Sims offered an affidavit corroborating the defendant's testimony.

16

of an extraction report prepared by the State police and used at trial by the prosecution did not reflect such a phone call with Sims.  The extraction report indicated that the defendant last accessed a contact named "Deja" at 2:37:57 A.M. --  about one and one-half hours after the shooting.[8]  See Acevedo, 446 Mass. at 442.

ii.  Failure to introduce "last time contacted" entry.  For the same reasons, we discern no deviation from accepted standards of practice based on trial counsel's failure to introduce the "last time contacted" entry referenced above to corroborate the defendant's affidavit that he was on the telephone with Sims immediately before the shooting. Furthermore, according to the affidavit of State police trooper Thomas Sullivan, which was filed in support of the Commonwealth's opposition to the defendant's motion for a new trial, that entry does not necessarily indicate that a call took place.  Instead, it may only indicate that the defendant accessed the contact on his phone.

Instead, trial counsel made effective use of the record to call the extraction report into question.  The extraction report indicated that twelve calls had been deleted.  Although the

---

[8] A subsequent extraction from the telephone in 2022 with newer software confirms that the defendant did not call Deja on February 9 or 10, 2017.

17

trooper testified on direct examination that all twelve deleted calls were shown in the report, during defense counsel's cross-examination, the trooper acknowledged that only two calls were marked deleted in red. This discrepancy would have allowed the jury to discredit the report and conclude that the defendant's phone call with Sims was missing from the report.

3. <u>Fajardo's testimony</u>. During trial, the judge ruled that Fajardo could testify to her observations of the defendant's "actions, his positioning, [and] whether she saw a firearm in his hand," but could not offer "the summary opinion impression that it looked like the defendant was trying to shoot the victim a second time." Nonetheless, in a nonresponsive answer to the prosecutor's question about what the defendant was doing with his hands, Fajardo testified that the defendant "looked like he was going to shoot [Blanton] again," prompting the defendant to request a mistrial. The judge denied the defendant's motion, struck the testimony,[9] and "forcefully" instructed the jury to disregard the stricken statement.

---

[9] Fajardo's testimony that the defendant "looked like he was going to shoot [Blanton] again" was properly struck as it was impermissible opinion testimony of the defendant's intent. See <u>Borella</u> v. <u>Renfro</u>, 96 Mass. App. Ct. 617, 625 n.22 (2019) (a lay witness is not permitted "to express an opinion about what someone was intending or planning to do based on an observation of the person"), citing <u>Commonwealth</u> v. <u>Jones</u>, 319 Mass. 228, 230 (1946).

Shortly afterward, the judge permitted Fajardo to testify that after shooting Blanton the first time, the defendant pointed the gun at him again, and Blanton said, "He's trying to shoot me again."  The defendant argues that the judge erred by (1) denying his motion for mistrial after the jury heard Fajardo's inadmissible opinion testimony that it looked like the defendant was going to shoot Blanton again, and (2) allowing Fajardo to testify that Blanton said, "He's trying to shoot me again."[10]  We disagree.

We review the denial of a motion for mistrial for abuse of discretion.  Commonwealth v. Bryant, 482 Mass. 731, 740 (2019).  "Where a party seeks a mistrial in response to the jury's exposure to inadmissible evidence, the judge may correctly rely on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant."  Id.  On this record, the judge did not abuse his discretion in denying the motion for mistrial.

The defendant also challenges admission of Blanton's statement, "He's trying to shoot me again."  The defendant does

---

[10] The defense did not object to Fajardo's testimony of Blanton's statement.  However, the defense filed a motion in limine prior to Fajardo's testimony to exclude Blanton's statement, properly preserving the issue on appeal.  See Commonwealth v. Hart, 493 Mass. 130, 143 n.8 (2023) (filing a motion in limine "is sufficient to preserve the issue").

not dispute that Blanton's statement was an excited utterance. Instead, he argues the statement was inadmissible opinion testimony of the defendant's intent. We disagree. Blanton's statement reflected his perception of the cause of his injuries and emotional excitement at the time; namely, that the defendant shot him and was trying to do so again. See Commonwealth v. Napolitano, 42 Mass. App. Ct. 549, 551, 554 (1997) (witness' testimony of victim's out of court statements that the defendant "tried to drown her" and "tried to kill her" admissible as excited utterances because they related to her "perception" of the "underlying event"). Therefore, the judge did not abuse his discretion in allowing Fajardo to testify as to Blanton's statement. Commonwealth v. Andre, 484 Mass. 403, 414 (2020) ("We review a judge's evidentiary rulings for an abuse of discretion").

4. The prosecutor's closing argument.[11] The defendant challenges three points made in the prosecutor's closing argument: (a) the argument that the defendant planned the attack; (b) the reliance upon Fajardo's excluded opinion testimony to suggest that the defendant aimed the gun at Blanton's "vital area"; and (c) the argument that all of the

_____

[11] Commendably, the judge encouraged the attorneys, before closing, to review the Massachusetts Guide to Evidence § 1113 regarding permissible and impermissible argument in closing.

20

deleted calls noted in the partial cell phone report were in the full extraction report.  We review the first two arguments for prejudicial error because the defendant objected.  See Commonwealth v. Lugo, 89 Mass. App. Ct. 229, 233 (2016).  As for the third argument, the defendant did not object and the standard of review is whether there was a substantial risk of a miscarriage of justice.  See id.

a.  Argument that the defendant planned the attack.  "Prosecutors are entitled to argue theories supported by the evidence and to suggest fair inferences from the evidence (which inferences need only be reasonable and possible, not necessary or inescapable)."  Commonwealth v. Correia, 65 Mass. App. Ct. 27, 31 (2005).  "The jury have the ability to discount hyperbole and other improper statements . . . and the trial judge's instructions are generally adequate to cure errors in the arguments."  Commonwealth v. Santiago, 425 Mass. 491, 495 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

Here, "premeditation can be inferred from the bringing of a firearm to the scene of the killing."  Commonwealth v. Robinson, 482 Mass. 741, 746 (2019).  The jury accepted that the defendant brought the firearm to the scene.  The jury also could infer that the defendant loaded the firearm as the ammunition in it matched the ammunition in his home and no ammunition was found

21

at the victim's home.  However, the prosecutor's argument that the defendant was angry on the way to Blanton's home and that he thought, "I want you dead" as he shot Blanton, was not supported by the evidence.

To the extent these arguments are improper, however, the judge's general instruction to the jury was sufficiently curative.[12]  Furthermore, it is apparent from the jury's verdict of second-degree murder that they disregarded the prosecutor's premeditation theory.  Commonwealth v. Tejada, 484 Mass. 1, 4, cert. denied, 141 S. Ct. 441 (2020) (elements of murder in first degree include premeditation).  Accordingly, we think the jury understood the judge's instruction and sufficiently parsed through the evidence to reach their conclusion.  See Commonwealth v. Lester, 486 Mass. 239, 249 (2020) (general instruction sufficiently curative where the prosecutor's misstatements in closing did not make a difference in the jury's conclusions).

b.  Argument that the defendant aimed the gun at Blanton's "vital area."  Although the prosecutor's argument that the defendant purposefully aimed the gun at Blanton's "vital area"

_____

[12] The judge instructed the jury that "there were arguments made during counsel's closing argument as to what inferences you might draw.  You should not draw any inferences unless you find that they are reasonable and that they are based on the evidence presented, not on some speculation and not on some conjecture."

22

may have been an inference, it was supported by the evidence. See Correia, 65 Mass. App. Ct. at 31.  Cf. Commonwealth v. Francis, 391 Mass. 369, 372-373 (1984) ("Although the prosecutor's closing argument offered a doubtful interpretation of the testimony, this version was, at least, within the reasonable inferences permissibly open to conjecture from the testimony in its light most favorable to the Commonwealth"). For instance, the evidence showed that the defendant shot Blanton in the chest at close range.  Moreover, there was evidence that, afterward, the defendant continued to straddle the victim while pointing the gun at him.  The prosecutor's argument was not improper.

c.  Argument concerning the extraction report.  The prosecutor argued in her closing that all the deleted calls in the extraction report were in the full 5,000 page report, which was not in evidence.  Although the full report was not in evidence, the prosecutor's argument was supported by the trooper's testimony.  See Correia, 65 Mass. App. Ct. at 31. When asked if the full extraction report reflected all the deleted calls, he responded, "As far as I know."  This was not error and even if it was, it did not present a substantial risk of a miscarriage of justice.

5.  Convictions of unlawful possession of a firearm and ammunition.  The defendant argues that that his convictions of

23

unlawful possession of a firearm and ammunition must be reversed due to the Supreme Judicial Court's decisions in Commonwealth v. Guardado, 491 Mass. 666 (2023) (Guardado I), and Commonwealth v. Guardado, 493 Mass. 1 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024). The Commonwealth concedes that the defendant is entitled to a new trial on the firearms-related offenses where the Commonwealth did not introduce evidence that the defendant lacked a license to carry firearms or a firearms identification card. Additionally, the judge, lacking the benefit of New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), Guardado I, and Guardado II, did not instruct the jury that nonlicensure is an essential element of the charges. Accordingly, we agree that the firearm and ammunition convictions must be vacated.[13]

Conclusion. We affirm the defendant's conviction of murder in the second degree and the order denying his motion for a new trial. We vacate the defendant's convictions of unlawful possession of a firearm and ammunition (counts two, three, and

---

[13] The defendant does not otherwise challenge the sufficiency of the evidence on these charges, or argue that he may not be retried on them.

24

four) and set aside those verdicts.  The Commonwealth may retry the defendant on the firearm and ammunition charges if it so chooses.

<u>So ordered</u>.

By the Court (Henry, Hand & Brennan, JJ.[14]),

*Paul Little*

Clerk

Entered:  June 23, 2025.

---

[14] The panelists are listed in order of seniority.